Bobby PERRY, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2010–SC–000833–MR.

Supreme Court of Kentucky.

Oct. 25, 2012.

Rehearing Denied Feb. 21, 2013.

Linda Roberts Horsman, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Julie Scott Jernigan, Assistant Attorney General, Office of the Attorney General, Criminal Appellate Division, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Appellant, Bobby Perry, was tried on two counts of first-degree sodomy, and was convicted of one count. The jury recommended a sentence of 45 years, which the trial court imposed. This Court reverses and remands for a new trial and proceedings in accordance with this opinion.

## I. Background

Among the most gut-wrenching cases this Court is required to review are child sexual assault cases. It is difficult to conceive how an adult human being could conceive of such acts, and carry them out against children. If true, the allegations of this case are such behavior. However, even an accused child molester is entitled to a fair trial, because otherwise we face a failure in the system of justice that must apply to everyone. Inherent in receiving a fair trial is the reasonable ability to make a defense.

In few cases are there so many allegations of abuse against so many people. C.P. alleges that he was sodomized by his adoptive father up to four times between the ages of ten and possibly up to around age 13, which are the acts that form the basis for this case. He also alleges that he was sexually abused by "a man on the railroad tracks," by a "homeless man in a dumpster," by a man named "Lance," by his two brothers, by his birth mother, by a young man named "Cody" who was in placement with him, by a stranger who let him use the phone when he ran away from another placement, by a girl named "Charmaine," and by his adoptive mother. He claims he attempted to rape two girls named "Molly" and "Diane." He made all these allegations around the same time he accused the Appellant, who is his uncle and adoptive father.

There is no physical evidence of any of the claims, and there are no witnesses. Each allegation is fairly detailed. The path that led to this Court is complicated, and timing is difficult to discern from the record.

C.P. was given up for adoption by the birth mother and father after the father was convicted and sent to prison. The appellant, Bobby Perry, is the brother of the birth father. His wife, Ernestine, is the mother of the birth mother, and thus is C.P.'s grandmother and adoptive mother. The Perrys adopted C.P. when he was an infant. They have no children together, but C.P. has two brothers, one of whom lived in the Perry household while the other lived with the birth mother. C.P. is fully aware of who his birth parents are, and saw the birth mother and sibling on occasion.

At some point, C.P. began running away from home and was out of control. The adoptive parents called the police for help to deal with his misbehavior. He was placed under orders by the district court, and when he failed to comply, he was placed with the Diocesean Catholic Children's home, a residential treatment facili-

ty for children with emotional and behavioral problems, in June 2007. There, he was given therapy with his family until he said he wanted no further contact with them. In November, 2007, he was arrested and charged with attempted rape of a girl named "Molly." At that time, he made no claim that he had been sexually abused by the Appellant. However, he first confessed to police that he had attempted to rape Molly, but later denied it when talking to therapists and counselors. He now claims he lied to the counselors because he thought that would keep him out of jail. While the charge was pending, he told a therapist that he had been sexually assaulted by a man on the railroad tracks, a story about which he would later tell several different versions. He ended up pleading guilty to an amended charge of fourth-degree assault on the attempted rape of Molly.

After a few months at Diocesean, he began exhibiting self-harming behaviors, and was given an in-patient placement in the North Key Community Care facility. He spent thirty days in-patient at North Key, and then was placed in the Children's Home of Northern Kentucky. After about four months, he ran away. It was during this time that he would later claim he had a sexual encounter with an adult male who let him use the phone. Later, in March of 2009, C.P. was placed in the Ramey–Estep Home in Ashland, Kentucky, which was run as a "boot camp." While there, C.P. had problems with another child named "Cody," of a sexual nature. He then told a therapist that he had been sexually abused by the Appellant in 2005, when he was 11 years old, and blamed his behavior with Cody on being abused himself. He mentioned two occasions Appellant had abused him to the therapist, claiming the second one occurred when he was 13. Later at trial, he described four occasions of sod-omy and claimed they ended around age 12 or maybe after he turned 13.

After C.P. was charged with attempted rape as a juvenile in November of 2007, he was ordered to be interviewed by the Children's Advocacy Center of Covington in early 2008 because he was sexually acting out. At that time, he was questioned about whether he had ever been sexually abused. Specifically, he was asked whether anyone had ever asked him to touch their bodies. He replied that one kid had asked, but that he didn't do it. He denied that anyone hit him at home, or that anyone had hurt him. He denied that anyone had ever touched him inappropriately. When asked whether he had seen anyone's "private part," he replied that he had seen and touched "Charmaine," a "girl [he] went out with." He expressed concern about the pending attempted rape charge. Later, in therapy, he told about the man on the railroad tracks abusing him, but at a date subsequent, he told another therapist that he had made it up because he thought it might help him with the attempted rape charge. Later, after accusing the Appellant, C.P. was interviewed by a psychiatrist, whom he told that he had been abused by a man on the railroad tracks, and that the abuse had lasted for months. And finally, at trial, he testified that the sexual encounter on the railroad tracks really did occur and gave descriptive details, but claimed only one occasion.

The accusations against the Appellant came near the end of C.P.'s stay at Ramey–Estep, when he was due to be returned to his adoptive parents' home. Instead, he was placed in foster care, where he remained as of the date of the trial.

After prosecution in this case began, C.P. was again interviewed at the Child Advocacy Center of Covington in 2009. The recording of this interview is not in the record, but it was discussed extensive-

ly by the attorneys and the trial court at a hearing regarding admissibility of the contents of the recording. At this interview, in marked contrast to his interview the year before, according to argument of counsel and the avowals at trial, C.P. spoke freely about various sexual contacts. He described four instances of sodomy with the Appellant. He claimed that his adoptive mother, who is also his maternal grandmother, had frequent vaginal, anal and oral sex with him *prior* to the time he claimed Appellant sodomized him. He described her taking him shopping to buy fancy lingerie for their enjoyment. Yet at trial, the tenor of his testimony against Appellant was that his "mom" did not know about the sodomy with Appellant and that it would not occur when she was around.

During the interview, he mentioned the railroad tracks incident again, but indicated it was consensual rather than forced. He described having sex in a dumpster with a man named "Champ" for five dollars. He claimed to have sexual contact with "Cody" at Ramey–Estep. He described running away from North Key and going to a man's home where he asked to use the telephone and then had sex with the man. He claimed that his birth mother would let him touch her "private" when she was going to the bathroom, and that when he grabbed her butt in K–Mart, she kissed him on the mouth. When questioned about this, she told Cabinet investigators that he had grabbed and kissed her, and denied anything further. He claimed to have had oral and anal sex with a man named Lance, and sexual contact with both his brothers. He stated that he had sex with Charmaine, and had attempted to rape Molly and Diane.

The trial court held a hearing under *Dennis v. Commonwealth*, 306 S.W.3d 466 (Ky.2010), which it described as a KRE 412 hearing, and determined that two of these prior allegations could be the subject of impeachment cross-examination at trial because they were "demonstrably false." The rest were excluded.

The Appellant was convicted of one count of first-degree sodomy, and was given a sentence of 45 years. His appeal to this Court is a matter of right because he received a sentence in excess of 20 years. *See* Ky. Const. § 110(2)(b).

## II. Analysis

In this appeal, Appellant argues that the trial court erred in denying an independent evaluation or competency hearing and in disallowing the introduction of impeachment evidence of other claims of sexual conduct, and that there was prosecutorial misconduct. Each claim will be addressed in turn.

### A. Competency Hearing and Independent Evaluation

■ This case presents a somewhat unusual question of competency. Before trial, the Appellant asked that C.P. be evaluated by an independent psychologist to determine if he was competent to testify in light of his treatment history, which included psychotropic drugs. The trial court denied the motion.

However, in 2008 when C.P. had his first interview with the Children's Advocacy Center before he had been given any psychotropic medication, he was obviously concerned with the pending attempted rape charge filed against him in juvenile court, but he strongly denied that anyone had any inappropriate sexual contact with him. He also denied that anyone had asked him to make such contact except for "one kid," which he denied doing, though he did admit that he was in court concerning the attempted rape of "Molly." By the time he gave his second interview after

claiming Appellant had sodomized him, he had been in several treatment settings, was accused of a sexual encounter with "Cody" during treatment, had attempted suicide, and had been given Seroquel, a powerful psychotropic drug. In late 2008, he expressed to one therapist, according to Appellant's motion for evaluation, that "he was not sure if what he was thinking was reality."

In its opening statement, the Commonwealth told the jury that they would have to determine whether the child was a really messed up kid who made these stories up about his adoptive father, or if he was a really messed up child because of what his father had done to him. Yet the trial court allowed little evidence to be introduced about C.P. being "messed up," including his use of Seroquel, because there was no expert to testify about the effects of the drug. The Appellant had asked for an independent evaluation of C.P. because of various issues gleaned from his records. Such an evaluation would have enabled Appellant to put on testimony about the effects of the Seroquel on C.P., and how various factors affected him throughout his course of treatment.

However, as the trial court pointed out, C.P. had been seen by many therapists, and they could have been questioned concerning his progress and the effects of the Seroquel. Apparently none of them had been subpoenaed for trial, although they may have asserted privilege. It is unclear from the record whether this was disallowed by the trial court or just not done by defense counsel. What is clear is that there is evidence that C.P. may have serious psychological problems that could contribute to his ability to understand the truth and the importance of testifying truthfully. This is one of those rare cases where a simple answer from C.P. that he understands, or the rote ability to state the

difference between the truth and a lie, might not signify actual competency.

As this Court has previously held, in certain circumstances, the requirements of due process and fundamental fairness can require that a criminal defendant be allowed to have a witness against him independently examined by a psychiatrist or psychologist. *See Mack v. Commonwealth*, 860 S.W.2d 275, 277 (Ky.1993). The trial court was aware of *Mack*, but criticized what he believed to be an inconsistency in the opinion, noting that on the one hand the defendant was entitled to have the witness examined as to possible mental "concoction or transference," *id.*, but on the other hand evidence of post-traumatic stress and transference was inadmissible because the defense had failed to establish those as proper medical diagnoses, *id.* at 278. The trial court, however, perceived inconsistency where there was none. Under the first issue in *Mack*, the Court declared that due process and fairness require an opportunity to look into whether a witness's testimony might be tainted by some psychological difficulty. Under the second issue, the Court held simply that no sufficient foundation had been laid for evidence of a related psychological impairment. If anything, the decision under the first issue would allow development of evidence that could be used to lay the foundation for the second issue.

More importantly, here the Appellant's motion raised the issue of C.P.'s competency to testify in light of possible mental problems and effects of the psychotropic drugs he was taking. Specifically, as the Commonwealth's brief admits, the Appellant argued that C.P. did not know the difference between truth and a lie. This goes to the requirements of KRE 601, which states generally that every person is competent to be a witness but bars a witness who:

(1) Lacks the capacity to perceive accurately the matters about which he proposes to testify;

(2) Lacks the capacity to recollect facts;

(3) Lacks the capacity to express himself so as to be understood, either directly or through an interpreter; or

(4) Lacks the capacity to understand the obligation of a witness to tell the truth.

KRE 601(b). The Appellant's claims go directly to these restrictions.

■ To that end, the trial court should have allowed an independent psychological evaluation of C.P. None of the treating therapists had evaluated him for the effect his psychological condition might have on his memory or ability to tell the truth. Such testimony could require a competency hearing if there was an indication that the child's recall was affected. At the very least, there could have been relevant and beneficial evidence that would aid a jury in gauging the reliability of C.P.'s memory, taking into consideration his psychological condition and medication. There are serious questions about this child's thought processes, clarity and motivations that were fairly raised by Appellant below. As a result of the error in *Mack*, the Court reversed the defendant's conviction and remanded for further proceedings. *Mack*, 860 S.W.2d at 278. We do the same in this case, and direct the trial court to order an independent psychological evaluation. If the evaluation indicates questions of competency, the court must conduct a competency hearing.

## B. Impeachment by Other Claims of Sexual Conduct

Initially, Appellant's counsel on appeal to this court (who was not trial counsel) argued that there had not been a proper hearing to determine if the various allegations of sexual conduct made by C.P. were admissible, and that the case should be remanded for such a hearing because of the substantive reasons Appellant argued to this Court. This was because the record failed to notate and include the video recording of the hearing the trial court did actually conduct. The Commonwealth then sought leave to file a supplement to the record which was the recording of the hearing. This Court allowed the supplemental filing, and in his Response the Appellant argued that the hearing actually conducted was insufficient and that the trial court erred in excluding evidence of the other claims of sexual conduct. After correction of the record, the question of sufficiency of the hearing is fully and properly before the Court. Further determinations are thus necessary as to the admissibility of the twelve other allegations of prior sexual conduct.

■ In any criminal case, important constitutional rights are at stake, including the right to confrontation and due process, and the defendant's continued liberty is at issue. In all criminal cases, the defendant has the right to make a complete defense. *See Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006). The importance of this right is especially apparent in cases that stem from an alleged victim's bare accusation. In a case in which there is no physical evidence and there are no witnesses, like the present case, the case becomes a pure credibility question for the jury. Consequently, the credibility of the alleged victim becomes the crucial element in the defendant's ability to make a defense.

■ Any analysis of the admissibility of prior sexual conduct generally begins with the question of whether it is barred by KRE 412(a). This rule, commonly known as the "rape shield rule," begins by stating that such evidence is "generally inadmissi-

ble." In particular, such evidence may not be offered to prove that an alleged victim engaged in other sexual behavior or to prove a sexual predisposition. The purpose of the rule is essentially to avoid inferences of bad sexual character being used to cast doubt on an alleged victim's claim of sexual assault, which is improper impeachment.

■ On its face, KRE 412(a) does not apply to evidence that a witness has made prior *false* accusations of sexual abuse. The rule bars "[e]vidence offered to prove that any alleged victim engaged in other sexual behavior" and "[e]vidence offered to prove any alleged victim's sexual predisposition." KRE 412(a)(1)-(2). A prior false accusation is neither "sexual behavior" nor "sexual predisposition"—it is merely a false statement. Moreover, when offered to show a prior *false* accusation, the evidence is not offered for the purpose that would bring it within the bar created by KRE 412. Thus, KRE 412(a) does not apply to this type of evidence. *Cf.* Fed. R.Evid. 412 Advisory Committee Notes, 1994 Amendments ("Evidence offered to prove allegedly false prior claims by the victim is not barred by Rule 412. However, the evidence is subject to the requirements of Rule 404.").

However, courts have recognized that evidence of a prior false accusation raises some special concerns because of the possibility that the prior accusation is true. For example, there is some concern that a creative lawyer could evade or "circumvent" KRE 412 by offering accusations under the guise of claiming they are false. *Dennis v. Commonwealth,* 306 S.W.3d 466, 472 (Ky.2010).

The nature of the evidence also raises special concerns under the KRE 403 balancing test that applies to all evidence. If the victim is telling the truth about the prior incident, evidence of the prior (true) accusation would have little or no probative value. And the victim would suffer the embarrassment and distress of being questioned about his or her prior victimization.

On the contrary, if an alleged victim has made prior allegations of sexual assaults that are *false,* this potentially reflects on the credibility of the allegation being tried, and it potentially provides evidence of a motive to make false accusations in the case being tried. In other words, the prior sexual conduct would not be offered to prove that the conduct actually occurred, but that it *did not.* The natural inference is that if the alleged victim lied in other allegations, then he may be lying about the defendant in the case being tried.

Thus, although KRE 412 does not directly apply, courts have considered its purpose when gauging admissibility of allegedly false prior accusations of sexual conduct. This Court recently struggled with these competing interests in *Dennis,* 306 S.W.3d 466, and concluded that evidence of a prior accusation would be admissible only if it was *demonstrably false.*

As we pointed out in *Dennis,* a trial court must "balance the Commonwealth's and the victim's interest in excluding collateral character evidence against the defendant's interest in confronting the victim with evidence genuinely and significantly bearing on his or her credibility." *Id.* at 475. *Dennis* specified that this balancing analysis is to be done at a hearing in which the proponent of the evidence must show that the prior accusation was demonstrably false. *Id.* The hearing at which this showing can be made differs from the usual hearing under KRE 412(c)(2) to decide whether evidence of prior sexual conduct fits under an exception. Rather, in this hearing, the trial court is looking at an allegedly false claim of prior sexual con-

duct to determine if there is enough indicia of *falsity* to allow admission of the false allegation into evidence for impeachment, rather than the usual KRE 412 assumption that the allegations of prior conduct are true, but subject to the specific exceptions in the rule. To distinguish, this Court will refer to hearings to determine potential falsity as *Dennis* hearings.

As the *Dennis* hearing held by the trial court in this case demonstrates, the term "demonstrably false" can be difficult to apply. As we defined it in *Dennis*, "the proponent must show that there is a distinct and substantial probability that the prior accusation was false." *Id.* In trying to apply this standard, the trial judge made several statements indicating that he thought the Appellant had to prove actual or absolute falsity.

No doubt, some of the confusion with the phrase "demonstrably false" arises from the mistaken assumption that it requires an absolute demonstration of the falsity of a claim, that is, that the allegation is literally false. But the terms "demonstrably false" and "distinct and substantial probability" do not require perfect proof of falsity. Such a high level of proof is never required in a legal action. Even the Commonwealth is only required to prove its case against a defendant beyond a reasonable doubt, which is less than absolute proof (or proof beyond any and all doubt). Extremely high burdens of proof are even less appropriate in preliminary determinations related to the admissibility of evidence.

Unfortunately, use of the word "false," which is inevitable given the nature of the claim, adds to the difficulty, since most people see claims as either true or false, with nothing in between. But again, needing to prove that a claim is false (or, for that matter, true) has no real bearing on the level of proof required to prove that fact. Consider, by analogy, a claim where falsity is a factual element: libel. That a libel plaintiff must show that a statement is false does not require absolute proof that the statement is false; rather, the plaintiff need only prove the fact of falsity by the appropriate level of proof (usually, by a preponderance of the evidence).

In order to show that a prior accusation is demonstrably false, the proponent of the evidence must show that the prior accusation had a distinct and substantial probability of being false. We reiterate that this does not require absolute proof of falsity. A distinct and substantial probability of falsity is like any other fact to be shown by an appropriate level of proof. We have settled on distinct and substantial probability of falseness in recognition that completely excluding this type of evidence does not give due deference to the Sixth Amendment right to confront and cross-examine witnesses, but admitting allegedly false prior allegations without substantial proof of their falsity likewise prejudices crime victims. This level of proof fairly balances both concerns.

Also, when falsity is reasonably questionable in cases involving prior accusations of sexual abuse, questioning the accuser about these claims may be the only way a defendant can establish a motive to lie in the case being tried. Cross-examination is "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). This right is recognized in the Sixth Amendment to the United States Constitution as well as Section 11 of the Kentucky Constitution.

The scope of cross-examination may be reasonably limited when courts are concerned with preventing harassment,

prejudice, confusion of the issues, or questioning that is cumulative or only marginally relevant. *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). But it may not be so limited that it prevents a defendant from making a complete defense. *Dennis,* 306 S.W.3d at 473 (citing *Holmes,* 547 U.S. at 324, 126 S.Ct. 1727).

■ The ability to cross-examine a witness about prior false accusations is at the core of the fundamental right to confront because such evidence goes to the witness's *motive.* By presenting this type of evidence, the defendant is not merely arguing that the witness has a general tendency to lie (though that too is relevant). More importantly, a defendant is arguing that the pattern of false accusations demonstrates an underlying motive. *Quinn v. Haynes,* 234 F.3d 837, 845 (4th Cir.2000) (recognizing the important difference between general credibility evidence and motive or bias evidence); *White v. Coplan,* 399 F.3d 18, 24 (1st Cir.2005). For example, the motive might be that the witness is trying to get more favorable treatment, or to get out of trouble for his or her own acts. The specific motive will depend on the facts of the case. But a clear pattern of arguably false accusations will usually be evidence from which a "reasonable jury might have received a significantly different impression of [the witness's] credibility." *Van Arsdall,* 475 U.S. at 680, 106 S.Ct. 1431.

And the mere fact that multiple accusations have been made has weight. Here, the trial court found that only two of a dozen allegations were demonstrably false. Partly, this is because it is impossible to prove the truth or falseness of some of the claims. But the fact that there are at least

*ten* such claims definitely gives rise to an inference of falseness of some or all of those claims. The question is whether the sheer volume of claims creates a substantial probability that they are false. A defendant is never required to prove absolute falseness. Thus if the manner of making multiple claims creates an inference of falseness based on the alleged victim's motives and the volume of claims, it becomes a jury question of how much weight to give to the claims rather than a question of law as to admissibility.

■ Further, though *false* claims do not fit under rape shield rules, many courts have recognized the serious tension between defendants' Sixth Amendment rights and the strict application of state rape shield rules. In *White v. Coplan,* 399 F.3d 18 (1st Cir.2005), for example, the First Circuit found a violation of the defendant's Sixth Amendment rights when he was prevented from cross-examining the eight- and twelve-year-old complaining witnesses about three prior accusations of sexual abuse they had made against other people. *Id.* at 21. The trial court had barred evidence of the prior accusations under the state's heightened proof requirement.[1] *Id.* at 26. Although the appellate court was careful to note that a heightened standard of proof for this type of evidence was not per se unconstitutional, it still found a violation of the right to confrontation under the facts of the case. *Id.* The court found that the defendant's right to confrontation had been violated because of the strong similarities between the past accusations and the present one, the inference of a motive that could be drawn from the prior accusations, and the fact that the defendant had "virtually no other way to

---

1. The trial court had found that it was "reasonably probable" that the prior accusations were false, but that the defendant could not meet the heightened "demonstrably false" standard. *White,* 399 F.3d at 24.

defend himself." *Id.* at 27. Other courts have reached similar conclusions when evidence of a prior false allegation was barred through application of the rape shield rule when there are facts that make the prior accusations particularly relevant or particularly important to a complete defense. *E.g. Sussman v. Jenkins,* 636 F.3d 329 (7th Cir.2011); *Redmond v. Kingston,* 240 F.3d 590 (7th Cir.2001); *Averilla v. Lopez,* 862 F.Supp.2d 987 (N.D.Cal.2012); *Baker v. McNeil,* 711 F.Supp.2d 1313 (N.D.Fla. 2010). The general rule of evidence is that relevant evidence is admissible, which gives the Rules of Evidence an "inclusionary thrust." *See Tuttle v. Perry,* 82 S.W.3d 920, 922 (Ky.2002) ("The law of evidence tilts heavily toward admission over exclusion, for there is an inclusionary thrust in the law that is powerful and unmistakable." (quoting Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.05, at 53 (3d. ed.1993))). The rape shield rule is an exception to this general approach and is a limited exclusionary rule. Because of the inclusionary thrust of the law of evidence, a limited exclusionary rule cannot outweigh the fundamental right to cross-examination when invoked by a claim of falsity, especially when the rule by its own language does not include *false* claims.

■■■ In *Dennis,* this Court provided several examples of what would and would not be sufficient to show that a prior accusation was demonstrably false, and those examples are still accurate under the clarified standard set out in this case. "[T]he victim's recantation of the prior allegation, an investigation which establishes pertinent facts wholly inconsistent with the allegation, or circumstances strongly suggesting that the victim had a motive to fabricate the prior and current allegations are all instances potentially justifying" cross-examination of the witness about the prior accusation. *Dennis,* 306 S.W.3d at 475. In addition to these examples, a proponent of this type of evidence could demonstrate a distinct and substantial probability of falsity if the alleged victim told different stories to different people or at different times. *See Quinn,* 234 F.3d at 848 n. 10. The examples listed here are not exclusive, and one can imagine other types of proof that would also meet the demonstrably false standard depending on the particular facts of the case. However, as stated in *Dennis,* a mere denial by the alleged perpetrator of the prior accusation or an inconclusive investigation would not be enough to demonstrate a distinct and substantial probability of falsity. *Dennis,* 306 S.W.3d at 475. Also, as was pointed out in *Dennis,* the prior allegation evidence must be probative under KRE 608(b) and must pass the KRE 403 balancing test.

This case provides a good example of the situation where the sheer number and variety of allegations, even when it cannot be proven that each claim is demonstrably false standing alone due to the impossibility of substantiating some of the claims, nonetheless can create a distinct and substantial probability that they are demonstrably false when considered together.

In this case, there was only one witness presented in the guilt phase of the trial— C.P. His testimony was brief and to the point. He claimed that Appellant, who is his natural uncle and adoptive father, sodomized him on four occasions, beginning when he was ten years old. The trial was held one day before his 16th birthday, some six years after he alleged the sodomy began. He also testified that he had lied to therapists about whether he had attempted to rape "Molly" and that he had told several different stories about the "man on the railroad tracks." He admitted that he denied any sexual assault in his

interview with the Children's Advocacy Center in 2008.

Under the trial court's KRE 412 rulings, defense counsel was allowed to cross-examine C.P. about the attempted rape of "Molly" and the railroad tracks allegations. Cross-examination on these statements and his statements during the 2008 interview was severely hampered, though, by counsel's inability to reference specific records and because C.P. frequently answered that he didn't remember, "but if your paper says I said it I did." However, counsel was not allowed to introduce her "papers" or to reference any of the other allegations C.P. had made. There was no physical evidence offered, and there were no witnesses to the alleged acts or even any witnesses that described the home setting or other events that could possibly have corroborated parts of C.P.'s testimony.

Having nothing to say other than he did not do it, the Appellant chose not to take the stand.

 This case squarely frames the situation where the case is simply one person's word against another's. And this is a case where the alleged victim had made multiple allegations of sexual conduct with other people near the time when the allegations against the Appellant first surfaced. To recap, near the end of his stay at Ramey–Estep, C.P. told his therapist that Appellant had sexually abused and sodomized him when he was 11 years old in 2005. This allegation was made around the time he had disciplinary problems there because of his sexual encounter with Cody, another resident. Due to this claim, he was again interviewed by the Children's Advocacy Center in 2009. This is when he alleged sexual conduct with 13 different people.

The question for the trial court regarding these allegations in the *Dennis* hearing was whether Appellant had demonstrated that there was a distinct and substantial probability that the allegations were false. The only way a defendant can show that is to present evidence raising questions about their falsity. The trial court was correct that the railroad tracks story was demonstrably false because C.P. had changed details of the story multiple times. Although the trial court did not have this information when it made its ruling, when C.P. was interviewed after the trial by the person making the sex offender assessment, he gave yet another version, claiming that the sex on the railroad tracks had actually happened to his adoptive father, not him, even though he had emphatically said the event had happened to him at the trial just a few weeks before. Likewise, C.P.'s actions of admitting the attempted rape of "Molly," then denying it, then saying the denial was a lie, and finally pleading guilty to an amended charge indicates that some version of the events is demonstrably false.

 However, the trial court erred when it found, *without reviewing the video tape of the 2009 interview*, that all the remaining ten allegations were not demonstrably false. The video tape of the 2009 interview is not in the record, and so this Court has not had an opportunity to review it. However, from the limited information available, it does appear that there is a legitimate question whether all twelve allegations could be considered to be demonstrably false. Most important to the analysis, the fact that all of these allegations came at the same time, in one single interview, and in conjunction with the two allegations that are clearly demonstrably false, could indicate a motive for C.P. to fabricate the allegations. *See Dennis*, 306 S.W.3d at 475. It is within a trial court's sound discretion to determine that the extreme number of allegations are demon-

strably false under the totality of the circumstances and therefore subject to cross-examination.

However, it is important to note that two of C.P.'s allegations involve C.P. as the sexual aggressor (the attempted rape of Molly and the attempted rape of Diane). Two others involve supposedly consensual sex with peers (sex with Cody and Charmaine). These allegations appear to fall more clearly under KRE 412 than the other allegations because they involve prior sexual behavior of the witness. While the trial court did conduct a hearing which was styled as a KRE 412 hearing, it did not conduct a proper *Dennis* hearing where the actual statements of C.P. were before the court or where the Appellant was able to offer anything more than the actual alleged statements when there were records and witnesses that could have reflected on the veracity of the allegations. On a remand, the trial court would have more information about these stories and would be able to determine the purposes for which Appellant is attempting to admit this evidence.

This Court reiterates that even if the prior allegations are demonstrably false, not all evidence related to the allegations is automatically admissible. The trial court must also consider whether the allegations are proper under the balancing test of KRE 403 as to probativeness versus undue prejudice, and whether defense counsel is limited to cross-examining the witness as to the false incidents or may offer extrinsic evidence for impeachment under KRE 608(b) and KRE 801A. Defense counsel must still comply with the Rules of Evidence concerning admissibility. *See Dennis*, 306 S.W.3d at 475 ("Under what rule or rules and under what circumstances, if any, extrinsic evidence of a prior false accusation would be admissi-

ble are questions we leave for another day.").

### C. Prosecutorial Misconduct

Parts of this argument are preserved and parts are not. Appellant claims that it was error for the prosecutor to define reasonable doubt in voir dire by saying that reasonable doubt is not all doubt; to argue that a scar on C.P. was not consistent with a suicide attempt because those cuts were oriented a different way; to argue the Child Sexual Abuse Accommodation Syndrome; to argue that C.P. committed the attempted rape to prove that he was not gay; and to argue that there was no proof C.P. had a mental illness when the trial court had prevented the defense from establishing mental illness by denying a competency evaluation or independent examination. We need not find specific error, since this Court has reversed on other grounds. However, since the alleged errors here are capable of repetition, we will state that it is improper to argue facts not in evidence, to argue theories that are not legally admissible, or to argue a lack of evidence when the trial court has ruled the evidence inadmissible.

### III. Conclusion

For the foregoing reasons, Appellant's conviction is reversed. The case is remanded to the trial court for further proceedings consistent with this opinion.

All sitting. ABRAMSON, CUNNINGHAM, SCHRODER and SCOTT, JJ., concur. VENTERS, J., dissents by separate opinion in which MINTON, C.J., joins.

VENTERS, J., dissents by separate opinion:

I cannot join the Majority opinion because I believe it deviates from our well-established rules for evaluating the compe-

tency of a witness pursuant to KRE 601, *Mack v. Commonwealth,* 860 S.W.2d 275 (Ky.1993), and *Bart v. Commonwealth,* 951 S.W.2d 576, 579 (Ky.1997). The Majority opinion substantially weakens the wall that protects witnesses from the unwarranted and humiliating intrusion of exploratory mental health evaluations, especially victims in rape and sexual abuse cases, and will further discourage victims and witnesses from reporting crimes and testifying against their assailants.

As evidenced by the heading in the Majority opinion titled, "Competency Hearing and Independent Evaluation," the Majority conflates the issue of C.P.'s competence as a witness and whether he should have been compelled to submit to a psychological evaluation so that the defense could impeach his testimony at trial. The Majority ignores the fact that Perry *never* requested an independent evaluation of the witness in connection with his motion to challenge C.P.'s competence under KRE 601. Perhaps he chose not to do so because our prevailing case law prohibits such evaluations. In *Bart v. Commonwealth,* 951 S.W.2d at 579, we said:

> We are unpersuaded that a defendant should be entitled to an independent evaluation of a nonparty witness to enhance his or her position in a competency hearing. We have long left witness competency decisions to the trial courts of this Commonwealth, and we perceive no compelling reason to disturb the traditional approach that the trial judge is

in the best position to make these decisions.[2]

The trial judge afforded Perry a full and fair hearing, giving Perry the chance to offer whatever proof he wanted of C.P.'s incompetence. He could have offered evidence to show anything in C.P.'s personal history, or elsewhere, that could support a finding that C.P. did not meet the competency standards we have established in KRE 601; but he did not.

After hearing arguments on the issue, the trial judge found C.P. to be competent to testify, citing C.P.'s age of nearly 16 years, his 84 IQ, his unquestioned ability to communicate, and his history of juvenile adjudications during which his competency had never been doubted. The evidence established that C.P. was making A's and B's in school. The determination of whether a child witness is competent to testify is within the sound discretion of the trial court. *Howard v. Commonwealth,* 318 S.W.3d 607, 612 (Ky.App.2010). Here, the trial court characterized Perry's motion as "frivolous" and summarily denied the motion subject to reconsideration upon the presentation of additional evidence of incompetency to testify. Perry never presented additional evidence of incompetency. The trial court manifestly did not abuse its discretion in determining that the victim was competent to testify.

Perry could have moved for an expert to evaluate C.P.'s competence or for funds to employ an expert to advise his counsel on the possible psychological ramifications of C.P.'s history and habits. He did not.

---

**2.** Lest one assume that C.P. presented more compelling symptoms of incompetence, consider that *Bart* involved a request to have experts evaluate the competence of a 15 year-old witness whose tales included hearing "voices [that] told her to do wrong things" and "voices [ ] of demons" telling her to kill herself and other people, seeing and talking to her dead grandmother and her dead father,

seeing demons with "thick eyebrows that came straight down, ears pointed, with real sharp teeth" and demons with animal bodies. "Yet, a review of the videotaped hearing also reveals a polite and rather articulate fifteen year old who testified that she knew the difference between the truth and lies. The victim demonstrated the ability to observe, recollect, and relate the facts." *Id.* at 578–79.

Was the trial judge supposed to *sua sponte* take the extreme step of forcing a witness to undergo a mental evaluation? Or, was the judge expected to offer Perry unrequested funds to obtain an expert consultant? I don't think so; the Majority apparently does.

What Perry *did* was wait until well after the ruling on his competency issue, and then less than 24 hours before the commencement of his trial, he presented the trial judge with a "Motion for Evaluation" seeking an "independent evaluation of C.P. by a licensed psychologist," citing to CR 35.01[3] and *Mack v. Commonwealth.* It was well within the trial court's discretion to deny the motion simply because of its untimely presentation on the eve of trial.

CR 35.01 is a civil rule that permits the court in limited circumstances to order a physical or mental evaluation of "a party, or of a person in the custody or under the legal control of a party." However, because a putative victim in a criminal case is not "a party, or a person in the custody or under the legal control of a party" the rule is obviously inapplicable to this type of situation. *See Mack v. Commonwealth,* 860 S.W.2d 275. Thus, Perry's reliance upon CR 35.01 was misplaced and the trial judge properly rejected it.

Of course, as we explained in *Mack,* due process and fundamental fairness entitle a criminal defendant to explore the complaining witness's mental condition, to seek relevant medical and psychological records relevant to the issue, to have the records examined by an expert witness, and to introduce the expert witness's conclusions if the testimony otherwise meets the applicable rules for admissibility. *See Id.* As now encapsulated in *Mack,* for criminal defendants to obtain the additional invasion of a victim's personal life by forcing her into mental evaluation, they must show that due process and fairness compels the examination *and* that there is a "substantial possibility" that an examination would provide "genuinely relevant and beneficial evidence." 860 S.W.2d at 277; *see also Turner v. Commonwealth,* 767 S.W.2d 557 (Ky.1988).

I respectfully submit that Perry utterly failed to satisfy those standards. Without any evidentiary basis whatsoever—because Perry presented none—the Majority "finds" what eluded the experienced trial judge: that a troubled life, a prescription for Seroquel,[4] and an apparently concocted tale about being abused by several members of his own family is all that is needed to establish a "substantial possibility" that a psychological examination would provide "genuinely relevant and beneficial evidence." And based upon *that,* and that alone, victims of sexual abuse, rape, and other crimes will be forced to undergo a

---

**3.** CR 35.01 provides: "When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician, dentist or appropriate health care expert, or to produce for examination the person in his custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made." Because a victim is not a party, or a person in the custody or under the legal control of a party, the rule is obviously inapplicable to this type of situation. *See Bart v. Commonwealth, supra* note 1.

**4.** The Majority describes Seroquel as a "powerful psychotropic drug" but for all that can be gleaned from the record, it is as likely to act as a truth serum as it is to render a witness incredible. Perry could have offered evidence on the point, but he did not.

humiliating psychological evaluation so that it can be determined if they are fit to appear as witnesses in our courts.

This case is not at all about the "competence" of C.P. He is clearly "competent" as we have defined that term for centuries. The Majority's real concern about the fairness of Perry's trial seems to arise not from C.P.'s competence or incompetence, but from his apparent lack of truthfulness as manifested in one meeting with his counselor. This concern is far better addressed through traditional rules for impeachment of witnesses under KRE 608,[5] and by vigorous cross-examination; not by using KRE 601 to ban the victim's testimony from the courtroom.

C.P. may, as the Majority suspects, be an inveterate liar, one who lies whenever it is convenient or advantageous for him to do so. Or, he may not be. However, in the long tradition of our jurisprudence, we do not silence the habitual liar and banish him from the witness stand. We impeach the habitual liar by exposing the lies. The established wisdom of our legal tradition, especially in criminal trials, holds that the people on the jury, not professional psychological "experts," are the best arbiters of a witness's truthfulness. The opinion we render today upsets that tradition.

Under the Majority's evisceration of this basic principle, a measurable portion of our citizenry could be barred from testifying in cases because, unfortunately, habitual and customary liars are all too plentiful. For example, fraud-oriented crimes often involve situations in which everything the participants do and say over a long period of time is an entire fabrication such that all of the members of a conspiracy to commit fraud might now be deemed incompetent to testify. In this vein, Bernard Madoff may have told many more lies than C.P. ever will. Would the majority suggest that someone like Madoff is incompetent to testify under KRE 601(d)? Of course not, because the purpose of that provision is not to weed out dishonest witnesses; it is to allow testimony from all but those who lack the minimal abilities of comprehension and communication.

KRE 601 establishes a presumption of competency and allows disqualification of a witness "only upon proof of incompetency." *Burton v. Commonwealth,* 300 S.W.3d 126, 142 (Ky.2009). Contrary to the Majority's application of the provision in this case, a propensity to lie does not equate to incompetence to testify, as the following sampling of cases plainly illustrates: *United States v. Zizzo,* 120 F.3d 1338, 1347 (7th Cir.1997) ("[E]ven the most dastardly scoundrels, cheats, and liars are generally competent to testify."); *Staton v. State,* 428 N.E.2d 1203, 1205–06 (Ind.1981) (It

---

5. KRE 608 provides that "(a) Opinion and reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise, (b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness: (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified. No specific instance of conduct of a witness may be the subject of inquiry under this provision unless the cross-examiner has a factual basis for the subject matter of his inquiry."

was not abuse of discretion to find the nine-year-old child witness to be competent to testify, even though her aunt testified that the child was "a born liar."); *United States v. Greenberg*, 419 F.2d 808, 809 (3d Cir.1969) (rejecting a defendant's argument on appeal that a perjurer should not have been allowed to testify against him); *United States v. Margolis*, 138 F.2d 1002, 1004 (3d Cir.1943) ("The appellant contends that because [the witness] was an admitted perjurer his testimony should not have been considered. Even a convicted perjurer, however, may testify competently. The jury must determine his credibility.").

In summary, I disagree with the Majority opinion because of what I consider its detrimental effects on well-considered, firmly-established, and sound principles of law. I also dissent from the Majority opinion because the trial judge did not err. He ruled upon Perry's challenge to C.P.'s competence based upon the evidence and arguments Perry put before him. That is, what a trial judge is expected to do. The judge was not asked to, and thus did not, order a psychological evaluation of C.P. There was no justification for the judge to do so *sua sponte*. When Perry did finally, on the day before the trial started, move for a professional evaluation of C.P., he presented no good cause for the judge to derail the scheduled trial. I believe the trial judge handled this case in exemplary fashion.

Notwithstanding my disagreement with the Majority's analysis of the essential issues on appeal, even under the Majority's view, reversal is not the proper remedy. The Majority has reversed Perry's conviction because the trial judge did not order a psychological evaluation of the victim and directs the trial judge to reconsider C.P.'s competence in light of the psychological evaluation to be conducted. The Majority

also reverses the conviction because the record does not show that the trial court properly considered *Dennis v. Commonwealth*, 306 S.W.3d 466 (Ky.2010), when it refused to allow impeachment of C.P.'s claim of being a victim of multiple incidents of sexual abuse, and directs the trial judge to reconsider the issue based upon the new explanation of *Dennis* set forth in the majority opinion. It is possible that in each instance, upon reconsideration as directed by the Majority opinion, the trial court will resolve the matter in the Commonwealth's favor, meaning that our decision herein effects no practical change in the evidence that the jury considered. Yet, with the conviction reversed, there is no alternative to a new trial if the Commonwealth elects to proceed with the prosecution.

The better remedy would be to order a retrospective competency hearing, as we have done when a trial court has improperly refused a hearing on the defendant's competency. I see no reason why the same remedy should not be adopted when we fault a trial court for not properly hearing the issue of a witness's competence. The trial court's consideration of the victim's allegedly "false" accusations under our new iteration of the *Dennis* standard could, likewise, be conducted in the nature of a retrospective hearing to see if the result is different. If it is, then and only then, would a new trial be required.

For the reasons expressed above, I respectfully dissent. Minton, C.J., joins.