Paul L. BRIGGS, Sr., Appellant

v.

Candace KREUTZTRAGER; Brandy Briggs; Keith Marlon Jones; Kevin Elam Briggs; Marsha Poe; and Angela White, Appellees.

No. 2013–CA–000020–MR.

Court of Appeals of Kentucky.

May 30, 2014.

Martin W. Johnson (argued), Benton, KY, for appellant.

James A. Harris (argued), Jr., Paducah, KY, for appellees, Candace Kreutztrager, Brandy Briggs and Keith Marlon Jones.

Before CLAYTON, TAYLOR and THOMPSON, Judges.

*OPINION*

THOMPSON, Judge:

Paul L. Briggs, Sr. appeals from the judgment of the Marshall Circuit Court entered following a jury verdict in a case involving two testamentary documents signed by Paul's father, Lloyd G. Briggs: a May 2, 2006, will and a June 14, 2006, Vanguard designation of beneficiary form. A jury found both testamentary documents invalid based on lack of testamentary capacity and undue influence asserted upon Lloyd by Paul and Paul's wife, Beth. Paul presents the following allegations of error: (1) the trial court erred when it permitted former Kentucky Supreme Court Justice William Graves to testify as an expert and refused cross-examination of Justice Graves regarding principles of law related to wills and undue influence in the execution of a will; (2) the jury instructions were erroneous because they did not contain principles of law, including various presumptions concerning testamentary mental capacity and undue influence; (3) the trial court erred in using a 2004 will to determine the property rights and interests of the parties; and (4) the trial court erred when it ordered Paul and Beth to appear in court post-judgment to be examined regarding Lloyd's assets. We affirm.

Lloyd was a Paducah attorney. In 2001, Lloyd prepared his own will leaving his estate to his "beloved" grandchildren, Cameron, Candace, Paul L. Briggs Jr.[1] and Brandy. He expressly left nothing to Paul and Kevin Briggs and stated his reasons. As to Kevin, he stated:

During his adulthood, Kevin Elam Briggs has derived great joy and satisfaction from hating me. In that Kevin Elam Briggs has very little of his past life to reflect upon that would afford him joy and satisfaction, I cherish anything

---

1. Paul Briggs Jr. was a party to this action but withdrew.

that will give my son enjoyment. In that his source of joy appears so limited his hatred for me must be preserved. A bequest to Kevin Elam Briggs could have the effect of [diminishing] this burning hatred he has for me and that he has carefully nurtured for these many years. I shall not be a party to it, I leave Kevin Elam Briggs nothing.

Lloyd's reasons for disinheriting Paul were stated with the same candor:

I have jealously guarded my assets with the goal of ultimately placing them in the hands of those who possess my blood. I have found this to be utterly impossible when dealing with a conduit with profound uxorious tendencies. I have taken my worth directly to my blood kin, my grandchildren, the children of Paul Lindsay Briggs to whom I leave nothing.

At trial, it was established that the "conduit" to which Lloyd referred was Beth.

In 2004, attorney Craig Housman prepared a will for Lloyd leaving his estate to his grandchildren. By that time, Paul had filed bankruptcy and had federal convictions for counterfeiting and conspiracy to distribute cocaine. Kevin also had federal drug convictions.

Lloyd accumulated a modest estate during his legal career. Additionally, in 2004, Lloyd's older brother, Garth Briggs, died leaving a $15,000,000 estate mostly as a result of his investment in Berkshire–Hathaway stock, and Lloyd inherited over $2,000,000, the majority of which he later placed in a Vanguard investment account. Paul and Beth, who moved in with Garth following a stroke, also inherited over $2,000,000 from Garth.

After Lloyd's inheritance from Garth began to be distributed in late 2005, Paul and Beth moved into Lloyd's residence. There was testimony that in April 2006, just days before the contested May 2, 2006 will, Paul "pistol whipped" Paul Jr., who was then residing with Lloyd, forcing him to leave the residence and have no contact with Lloyd. The other grandchildren and Lloyd's friends were also prevented from contacting Lloyd. There was evidence that Beth controlled Lloyd's pain medication at her discretion and that Paul and Beth controlled Lloyd's daily activities in the home. Paul was granted Lloyd's power of attorney and complete control over Lloyd's finances. There was also testimony that Lloyd feared Paul after he moved into the residence and gained control of his money.

Animosity existed between Beth and Lloyd. In 2004, Beth reported to law enforcement that Lloyd misappropriated funds from Don Clark, a disabled man for whom Lloyd had provided care for twenty years. Consequently, Beth became Don's guardian and gained control of his money, and Lloyd was indicted for theft in 2005. Lloyd's attorney, Del Pruitt, testified Lloyd knew he was innocent and was angry at Beth. Pruitt testified that by early 2006, Lloyd was incompetent to assist in his defense and, in May 2006, he filed a motion to continue the case because of Lloyd's incompetence.

In May 2006, 78–year–old Lloyd suffered from Alzheimer's, leukemia, severe spine disease, congestive heart failure, and brain damage. He was prescribed various pain medications and anti-depressants. He was confined to a wheelchair and often bedridden. There was medical testimony that he had significantly diminished capacity for information processing, problem solving, memory, reasoning evaluation, cognitive flexibility, decision-making and multitasking.

The May 2, 2006 will was drafted while Paul and Beth resided in Lloyd's residence. Beth testified that over a period of

three days, Lloyd instructed her to draft his last will and testament on a computer in Lloyd's home. Two of Paul's friends witnessed the will signing which, as recited in the will, occurred at 5:45 p.m. on May 2, 2006. Because the bequeaths in the 2006 will were a drastic departure from those in the 2001 and 2004 wills and is the contested will, we recite it extensively:

Go in the name of God, amen.

I, Lloyd G. Briggs, a resident of the State of Kentucky, residing at 13853 U.S. 68 East, Benton, KY, declare that this is last will and testament.... I revoke all wills and codicils that I have previously made. I name my executors Marsha Poe of the Sharpe area and Angela White of Paducah, KY.

I leave all my property located on or about 13853 U.S. 68 East., including a new modular home with 2 car attached garage along with two additional buildings and one 1984 single trailer. All other personal, real and mixed property to be left to Paul L. Briggs, Sr. not otherwise mentioned. To include all automotive vehicles not here to fore mentioned.

I leave two shares of Berkshire Hathaway A, recently received from my brother Garth Briggs Estate, to my youngest son Kevin Elam Briggs. I want to leave the remaining Berkshire Hathaway A & B shares to my son, Paul L. Briggs, Sr.

By way of explanation of the disproportion bequest to my two living sons, I expect my eldest son Paul L. Briggs Sr. to look after the remaining Briggs family (known as grandchildren) as best he can without any firm restraints. At the drawing of this instrument I have four grandchildren; Cameron Jones, Candace Briggs, Paul L. Briggs, Jr., Brandy Briggs. Those not mentioned were intentionally not mentioned.

If this last will and testament is contested in any form by anyone, then that said person will forfeit their rights listed in this instrument.

Following the date and signature line was a declaration that Lloyd executed the will voluntarily and without undue influence.

In pretrial depositions, Paul and Beth testified Lloyd was in good mental and physical health on May 2, 2006, and home all day. However, the evidence introduced at trial presented an entirely different picture of Lloyd's mental health on May 2, 2006. The jury learned that on May 2, 2006, a Lourdes Home Health Care nurse had seen Lloyd. Beth had been alone with Lloyd when he suffered an acute episode of shortness of breath due to congestive heart failure. At 2:22 p.m., the nurse charted:

Patient very drowsy. Family reports he has been sleeping most of the time for past two days....Patient noted to have labored breathing ... Family very concerned. Unable to contact Dr. Martin. Family reports they will take patient to ER for evaluation.

At 7:10 p.m., and after the will signing, Lloyd arrived at Lourdes Hospital where he was noted to be very impulsive, was cursing, combative, and anxious and wandering naked in his room confused as to place and time with altered thought processes. He was charted to have dementia.

After the 2006 will was executed, Paul obtained a Vanguard designation of beneficiary form which Paul completed for Lloyd's signature on June 14, 2006. Paul was made the sole beneficiary and Beth a contingent beneficiary. Again, contrary to Paul and Beth's testimony that Lloyd was mentally competent until his death, a Lourdes Home Health Care nurse record dated June 12, 2006, charted Beth reported Lloyd had been incoherent and bedridden for four days. Following Lloyd's

death on July 30, 2006, Paul received $1,340,293 from Lloyd's Vanguard account.

On direct examination, Justice Graves acknowledged he knew Lloyd professionally and personally and described Lloyd as a careful, skilled and "very good" lawyer with very good writing and proofreading skills. Justice Graves testified he had knowledge of the basics of will preparation and the proficiency expected of a lawyer in will preparation. He reviewed the will Lloyd prepared for himself in 2001 and found it to be lucid, skillfully drafted and met professional standards. He then reviewed and compared the 2006 will which he found was ambiguous, flawed with unfinished sentences, contained glaring typographical and grammatical errors, nonsensical and confusing. He opined the 2006 will was not written with the legal skills he knew Lloyd possessed or possessed by any person with a law degree.

On cross-examination, over objection, Paul's counsel was permitted to question Justice Graves concerning *Bye v. Mattingly*, 975 S.W.2d 451 (Ky.1998), an opinion espousing extensive legal principles involving testamentary capacity and undue influence. Initially, Paul's counsel requested Justice Graves read directly from *Bye* quoting various abstract legal principles. Finding this line of questioning laborious, the trial court ordered Paul's counsel to simply read the separate legal principles contained in *Bye* and request Justice Graves acknowledge their accuracy. The abstract legal principles from *Bye* that Paul's counsel sought acknowledgment are summarized as follows:

1) There is a strong presumption in favor of a testator possessing adequate testamentary capacity which can only be rebutted by the strongest showing of incapacity.

2) Kentucky is committed to the doctrine of testamentary absolutism, whose practical effect is that the privilege of citizens to draft wills to dispose of their property is zealously guarded by the courts and will not be disturbed based on remote or speculative evidence.

3) There is a minimum level of mental capacity required to make a will. It is less than that necessary to make a deed or a contract.

4) Merely being an older person, possessing a failing memory, momentary forgetfulness, weakness of mental power or lack of strict coherence in conversation does not render one incapable of validly executing a will.

5) Under the "lucid interval doctrine" when a testator is suffering from a mental illness which ebbs and flows in terms of its effect on the testator's mental competence, it is presumed that the testator was mentally fit when the will was executed.

6) In addition to demonstrating that undue influence was exercised upon the testator, a contestant asserting undue influence must also show influence occurring prior to or during the execution of the will; undue influence exercised after the execution of the will has no bearing whatsoever upon whether the testator disposed of her property according to her own wishes.

7) Merely demonstrating that the opportunity to exert undue influence existed is not sufficient to sustain the burden of proving that such influence was exerted.

8) The burden is on those persons challenging a will to prove that the testator lacked testamentary capacity when that will was signed.

9) Undue influence is that level of persuasion that will destroy a person's free will and replace it with the desires of that person exerting the influence.

10) To be undue influence on a testator, it must be the kind that would be inappropriate. Influence from acts of kindness, appeals to feeling or arguments addressed to the understanding of the testator are not inappropriate and are permissible.

The trial court permitted Paul's counsel to elicit Justice Graves to acknowledge nine of the above recited principles directly from the *Bye* case. However, convinced the cross-examination had exceeded its permissible scope and, instead, quickly becoming a legal seminar on the law of testamentary capacity and undue influence in the execution of testamentary documents, the trial court halted the cross-examination and met with counsel in chambers. The trial court acknowledged it allowed the questioning to go beyond the scope of cross-examination by permitting Justice Graves to be questioned regarding the abstract principles of law espoused in *Bye* and invited appellees' counsel to move for a mistrial or request an appropriate admonition. After extensive discussion among the trial court and counsel, the trial court ruled that no further questioning of Justice Graves regarding *Bye* would be permitted, and the trial continued.

Paul's proposed instruction to the jury mirrored the *Bye* legal principles that he sought to elicit as "evidence" through his cross-examination of Justice Graves, including the various presumptions of testamentary capacity under Kentucky law. The trial court rejected the detailed, law-laden instructions proposed by Paul and instructed the jury by setting forth the general definitions of sound mind and undue influence as follows:

A person is of sound mind for the purpose of making a will document if at the time of its execution he/she has such mental capacity as to enable him to know the natural objects of his bounty, his obligation to them, and the character and value of his estate, and to dispose of such estate according to a fixed purpose of his own.

Undue influence is any influence obtained over the mind of the testator to such an extent as to destroy his free agency and leave him to do against his will what he would not do otherwise, whether exerted at one time or another, directly or indirectly, if it so influenced his mind at the time he signed the May 2, 2006 will document. But any reasonable influence resulting from acts of kindness or from appeals to the feeling or understanding, and not destroying free agency, is not undue influence.

With the exception of necessary differences in reference to document types and dates, the instruction regarding sound mind and undue influence regarding the Vanguard designation beneficiary form were the same.

Following the jury's verdict, on December 5, 2012, the trial court issued its trial order and judgment declaring Lloyd's 2006 will invalid and setting aside the Marshall District Court's order of probate. It further ordered the Vanguard designated beneficiary form document invalid and the $1,340,293 assets acquired by Paul from the Vanguard account assets be transferred to the Estate of Lloyd G. Briggs. Paul was ordered to pay and deliver to the executors of the Estate of Lloyd G. Briggs $1,340,293 with prejudgment interest at the rate of 8% and 12% post-judgment interest. Paul and Beth were ordered to appear in court on December 17, 2012, to be examined concerning Lloyd's assets and asset transfers. After Paul's motion for a new trial was denied, this appeal followed.

 Paul argues Justice Graves should not have been permitted to testify as an expert witness because his testimony went to the ultimate issue in the case and

his notoriety as a former district and circuit judge and Kentucky Supreme Court Justice rendered his testimony more prejudicial than probative. Kentucky Rules of Evidence (KRE) 403. Notably absent from the beginning of Paul's argument is "a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner." Kentucky Rules of Civil Procedure (CR) 76.12(4)(c)(v). "Compliance with this rule permits a meaningful and efficient review by directing the reviewing court to ... where in the record the preceding court had an opportunity to correct its own error before the reviewing court considers the error itself." *Hallis v. Hallis*, 328 S.W.3d 694, 696–697 (Ky.App. 2010). "Our options when an appellate advocate fails to abide by the rules are: (1) to ignore the deficiency and proceed with the review; (2) to strike the brief or its offending portions, CR 76.12(8)(a); or (3) to review the issues raised in the brief for manifest injustice only[.]" *Id.* at 696.

■ Despite the deficiency in Paul's brief, we have viewed the entirety of Justice Graves's testimony and discovered the omission of citation to the record where the issues pertaining to Justice Graves's direct testimony was preserved is more than a mere oversight by appellate counsel. During Justice Graves's testimony, there was not a single objection uttered by Paul's counsel. It is a "fundamental concept that one waives error at the trial level by failing to properly and timely object or otherwise bring the error to the attention of the trier of fact." *Osborne v. Pepsi–Cola*, 816 S.W.2d 643, 645 (Ky.1991) (superseded by statute on other grounds). Consequently, we decline to review the merits of Paul's alleged errors pertaining to Justice Graves's direct testimony or any alleged prejudice created by his status as a former judge and Supreme Court Justice.

■ The issues presented concerning the trial court's limitation on the scope of Paul's cross-examination of Justice Graves and the jury instructions are inescapably intertwined. Paul contends questioning Justice Graves concerning the legal principles espoused in *Bye* was essential to "determine Justice Graves's credibility and to explore fully his knowledge of the current law on these matters." These same legal principles were included in Paul's proposed instructions.

Paul's contention that counsel's cross-examination of Justice Graves was relevant for the purpose of impeaching Justice Graves's credibility or knowledge of the law is undeniably suspect. On direct examination, Justice Graves was not asked and did not express any expert opinion regarding the elements of mental capacity to execute a will or undue influence. He testified only as to his personal knowledge of Lloyd's legal skills and the professional standards for preparation of a will. We cannot fathom how requesting Justice Graves to recite the legal precedent established in *Bye* would confirm or attack his credibility or knowledge of the law. Without reservation, we are convinced the sole purpose of eliciting this testimony and Paul's proposed instructions was to inform the jury of abstract principles of the law regarding testamentary mental capacity and undue influence favorable to his position.

■ As a precursor to our further discussion, we note the discretion afforded the court to permit or limit cross-examination: "The scope of cross-examination may be reasonably limited when courts are concerned with preventing harassment, prejudice, confusion of the issues, or questioning that is cumulative or only marginally relevant." *Perry v. Commonwealth*, 390 S.W.3d 122, 130–131 (Ky.2012). We review a trial court's decision relating to the

scope and duration of cross-examination under an abuse of discretion standard. *Commonwealth, Dept. of Highways v. Smith,* 390 S.W.2d 194, 195–196 (Ky.1965).

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Ironically, Paul's own statements in his brief contradict his contention that the legal principles in *Bye* had any relevancy as evidence when he states "the only expert on the law is the trial judge." His statement is pungently correct.

The presumptions in *Bye* and its progeny regarding Lloyd's mental capacity to execute a testamentary document did not make the existence of any fact the jury would consider in its deliberations any more or less probable. As in any civil case, the presumptions serve as a benchmark for the trial judge to consider in determining whether to grant or deny a directed verdict and have no role in the jury's deliberations. The effect of presumptions in the fact-finding process was stated with clarity in *Rentschler v. Lewis,* 33 S.W.3d 518, 520–521 (Ky.2000):

> The existence of a presumption serves only to require the party against whom it operates to introduce evidence to rebut it. If this burden of going forward is not satisfied, the party in whose favor the presumption operates is entitled to a directed verdict. **If the burden is satisfied, the presumption disappears and plays no further role in the case.** Commentary to KRE 301, Evidence Rules Study Committee, Final Draft (1989). As a general rule, civil law presumptions "live and die 'without the knowledge of the jury, and without affecting the judge's charge in any way,'" primarily because juries are thought to

be incapable of understanding the legal aspects of their application. R. Lawson, *The Kentucky Evidence Law Handbook* § 10.05, at 552, 553 (3d ed. Michie 1993) (quoting Morgan, *Instructing the Jury Upon Presumptions and Burden of Proof,* 47 Harv. L.Rev. 59, 75 (1933)). (Emphasis added).

 Because all presumptions have disappeared when jury deliberations commence, under Kentucky's bare-bones approach to jury instructions in civil cases, presumptions and details on the nuances of the law should not be included. *Olfice, Inc. v. Wilkey,* 173 S.W.3d 226, 228–229 (Ky.2005). In *Olfice,* our Supreme Court cited with approval the principles enunciated by well known commentators on Kentucky law:

> [T]he function of instructions is only to state what the jury must believe from the evidence in order to return a verdict in favor of the party who bears the burden of proof.... They should not contain an abundance of detail, but should provide only the 'bare bones' of the question for jury determination.

Kurt A. Philips, Jr., 7 *Kentucky Practice: Rules of Civil Procedure Annotated,* § 51 (5th ed.1995) (*citing Webster v. Commonwealth,* 508 S.W.2d 33, 36 (Ky. 1974)). Justice Palmore likewise observed:

> The basic function of instructions in Kentucky is to tell the jury what it must believe from the evidence in order to resolve each dispositive factual issue in favor of the party who bears the burden of proof on that issue. In other jurisdictions, as at common law, **it may be appropriate to say that the purpose of instructions is to advise the jury on the law of the case, but not in this state.**

*Id.* (emphasis added). Testamentary capacity and undue influence cases are not

excepted from the rule, and the jury should not be instructed that there are presumptions of ·mental capacity and undue influence. *Belcher v. Somerville,* 413 S.W.2d 620, 623 (Ky.1967).

We conclude it was not error for the trial court to halt what it properly determined was an attempt to interject irrelevant legal presumptions to the jury under the guise of impeachment evidence. Because the nuances of the law and presumptions should not be included in instructions, it was likewise not error for the trial court to reject Paul's proposed jury instructions.

Paul contends the trial court could not use the 2004 will that had not been probated to determine the rights and interests of the property rights and interests of the parties, and Paul and Beth could not be ordered to appear post-judgment to be examined, under oath, concerning Lloyd's assets and asset transfers. Neither contention is worthy of extensive discussion.

No assets were distributed in this action in accordance with the 2004 will. This action only declared the 2006 will invalid. Following the judgment declaring the 2006 will invalid, the trial court did not err in requiring Paul and Beth to be examined regarding the assets that they wrongfully acquired.

Based on the foregoing, the judgment of the Marshall Circuit Court is affirmed.

ALL CONCUR.