# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: DECEMBER 18, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0487-MR

JAMES EDWARD WATTS                                APPELLANT


V.               ON APPEAL FROM GRAVES CIRCUIT COURT
              HONORABLE TYLER L. GILL, SPECIAL JUDGE
              NO. 21-CR-00299


COMMONWEALTH OF KENTUCKY                      APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Following a four-day trial, a Graves County jury convicted James Edward Watts ("Watts") of one count of sodomy in the first degree, victim under twelve, one count of sexual abuse in the first degree, victim under twelve, and one count of indecent exposure in the first degree, first offense. He was sentenced to life imprisonment. Watts now appeals as a matter of right and challenges his convictions, including a challenge to the trial court's denial of his motion to try he and a co-defendant separately. *See* KY. CONST. § 110(2)(b). Having reviewed the record, the arguments of the parties, and the applicable law, we affirm the Graves Circuit Court.

# I. BACKGROUND

James Lewis Watts ("James Lewis") and Sarah[1] married in 2015 and lived in Mayfield, Kentucky, with Sarah's minor children, G.T., A.D., and M.D.,[2] until around 2018. A few months later, James Lewis' brother, Appellant James Edward Watts ("Watts"), moved in, soon after followed by their mother, Maggie, and Maggie's boyfriend, Chris. Sarah and James Lewis shared a bedroom, Watts and G.T. shared a bedroom, A.D. and M.D. shared a bedroom, and Maggie and Chris slept in the living room. Sarah and James Lewis worked various jobs and Watts stayed home with the children. Watts did not drive and was mostly unemployed during that time.

In March 2017, law enforcement and the Cabinet for Health and Family Services ("CHFS") began investigating allegations of incidents of a sexual nature between A.D. and Watts. CHFS ultimately found the allegations to be unsubstantiated. Around this same time, James Lewis and Sarah's relationship turned rocky. Sarah had discovered infidelity by James Lewis, and the couple separated in Fall of 2017. Sarah and her children moved out, and G.T. moved in with his biological father, while A.D. and M.D. moved to Georgia to live with their aunt. James Lewis and Sarah ultimately divorced in February 2018.

---

[1] Sarah is a pseudonym used to protect the identity of the victims.

[2] The events giving rise to this case were alleged to have occurred between January 2017 and August 2017. G.T. was born in August 2007, making him around nine years old during the relevant timeframe. A.D. was born in March 2010, making her six or seven years old during the relevant timeframe. M.D. was born in February 2011, making her five or six years old during the relevant timeframe.

In Fall of 2020, CHFS and law enforcement received a second report of sexual abuse. This time, the allegations concerned sexual abuse between both James Lewis and all three children, and Watts and G.T. and A.D. As part of the ensuing investigation, each child underwent a forensic interview. The case was forwarded to the Graves County Grand Jury, which ultimately indicted Watts on one count of sexual abuse in the first degree, victim under twelve years of age; one count of sodomy in the first degree, victim under twelve years of age; and one count of indecent exposure in the first degree. A Graves County Grand Jury later charged Watts in a superseding indictment with three counts of sodomy in the first degree, victim under twelve; three counts of sexual abuse in the first degree; and one count of indecent exposure in the first degree, first offense.

All three children testified at trial. G.T. testified to two incidents between him and James Lewis, both taking place in James Lewis' bedroom. For the first incident, G.T. testified that James Lewis called G.T. into James Lewis' bedroom, locked the doors behind him, and began masturbating in front of G.T. before forcing G.T. to perform oral sex on him. The next incident allegedly occurred when G.T. thought he was in trouble and bent forward anticipating a spanking but instead felt James Lewis' "penis going into [his] butt."

G.T. testified to two incidents between him and Watts. The first incident allegedly occurred while G.T. was taking a shower. G.T. testified that Watts entered the bathroom and opened the shower curtain, and G.T. felt "something on [his] back that was not water." G.T. testified that after he got out of the

3

shower and bent over to pick up his clothes, Watts' "penis inserted into [his] butt." The second alleged incident involved oral sex performed by Watts on G.T. in the bedroom the two shared.

A.D. testified to two incidents between her and James Lewis. The first occurred when James Lewis called her into his bedroom, shut the door, pulled down his pants, and instructed her to perform oral sex on him. She complied. She testified that James Lewis told her that if she told anyone, he would take away her Christmas presents. The second incident involved both A.D. and M.D. A.D. testified that James Lewis called them both into his room and told M.D. to face the wall. James Lewis then instructed A.D. to get on the bed and started rubbing her genitals. After, he instructed her to pull up her pants and face the wall.

A.D. testified to two incidents between her and Watts. She testified that the first incident was when Watts called her into his bedroom, shut the door, and instructed her to perform oral sex on him. She complied. She testified that Watts threatened to "whoop her" if she told anyone. The second incident occurred when she was taking a bath. Watts came in the bathroom, picked her up, put her on the counter, and rubbed her genitals.

M.D. testified only to the incident which occurred between her, James Lewis, and A.D. She testified that he called her and A.D. into his bedroom, locked the door, and told A.D. to face the wall. She testified that James Lewis told her to take off her clothes, he took off his pants, and he "put something white on [her] stomach and then wiped it off with a towel." He then told her to

4

put her clothes back on and face the wall next to A.D. James Lewis then called A.D. to come to him. M.D. did not see what occurred between James Lewis and A.D. but could hear heavy breathing. M.D. did not allege abuse by Watts.

The jury ultimately found Watts guilty of one count of sodomy in the first degree, victim under twelve; one count of sexual abuse in the first degree, victim under twelve; and one count of indecent exposure in the first degree, first offense, all stemming from Watts' interactions with A.D. The trial court followed the recommendation of the jury and sentenced Watts to life in prison.

Additional facts will be developed below as necessary.

## II. ANALYSIS

On appeal to this Court, Watts alleges the trial court made various errors requiring reversal. First, Watts alleges that the trial court erred by joining James Lewis and Watts for trial, and that, even if joinder was proper, Watts was prejudiced by the joinder and therefore the trial court erred in declining to grant him a separate trial. Second, Watts alleges that the trial court erred by improperly excluding evidence of Sarah's pattern of reporting false allegations of abuse by men in her life. Third, Watts alleges that the trial court erred by allowing the Commonwealth to play for the jury two videos depicting G.T. and Watts. Fourth, Watts alleges that the trial court violated Watts' right to confront witnesses against him, both by allowing the Commonwealth to introduce a statement made to police by James Lewis, and by rearranging the courtroom so that the witnesses were seated with their backs to the defendants as they testified. Last, Watts alleges that his convictions of both sodomy and

5

indecent exposure violated Kentucky's statutory restraints on double jeopardy. Each of these alleged errors will be addressed in turn.

## A. The trial court did not abuse its discretion by joining Watts and James Lewis for trial.

Prior to trial, Watts moved for a separate trial, which the trial court denied and joined James Lewis and Watts together for trial. On appeal to this Court, Watts argues that it was improper for the trial court to join James Lewis and, even had joinder been proper, this joinder prejudiced him and so he should have been granted a separate trial.

"We review the trial court's denial of a motion to sever for abuse of discretion, . . . and the burden is on the appellant to show that the denial was in fact unfairly prejudicial." *Peacher v. Commonwealth,* 391 S.W.3d 821, 834 (Ky. 2013) (citing *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 26 (Ky. 2011)). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

"We have a long-recognized preference in our criminal law for jointly trying defendants who are, or could have been, jointly indicted. Joint trials promote judicial economy and consistent verdicts; but they present unique difficulties, as well." *Darcy v. Commonwealth*, 441 S.W.3d 77, 79 (Ky. 2014). Kentucky Rule of Criminal Procedure ("RCr") 9.12 states:

> The court may order two (2) or more indictments, informations, complaints or uniform citations to be tried together if the offenses, and the defendants, if more than one (1), could have been joined in a single indictment, information, complaint or uniform citation. The

6

procedure shall be the same as if the prosecution were under a single indictment, information, complaint or uniform citation.

RCr 6.20 states:

> Two (2) or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the **same act or transaction or in the same series of acts or transactions constituting an offense or offenses**. Such defendants may be charged in one or more counts together or separately, and all of the defendants need not be charged in each count.

(emphasis added).

Watts argues that joinder was improper because he and James Lewis "did not participate in the same acts or transactions constituting an offense or offenses" as required under RCr 6.20. Watts argues none of the alleged incidents involved both defendants, and they were not charged with complicity. The defendants were not indicted together, and Watts' indictment does not mention James Lewis. No evidence was presented that either brother knew what the other was doing or that either brother assisted the other in providing opportunity to commit the crimes, facilitating the crimes, or concealing the crimes.

However, while Watts and James Lewis did not jointly commit the same act, they both were involved in the same *series of acts*. The nature of the sex acts Watts and James Lewis were alleged to have induced were similar — both were accused of forcing both A.D. and G.T. to perform oral sex on them, forcing G.T. to receive anal sex, rubbing A.D.'s genitals, and threatening to punish A.D. if she disclosed the abuse. We have said:

7

> The advantages of joint trials, whether of multiple charges or multiple defendants, are obvious. Trials are costly and burdensome to courts, parties, witnesses, and victims, so the savings from resolving a matter in a single trial rather than two or more separate trials are significant. This seems especially so when the evidence for separate counts will overlap to a considerable extent. It seems wasteful to require the Commonwealth to put on the same proof multiple times, to require witnesses to attend and give the same testimony at different trials, and to require separate juries to consider substantially identical evidence. Joinder also helps assure that defendants are tried for their alleged offenses in a timely manner. A joint trial, moreover, by allowing a single jury to pass on all the charges and to hear all the evidence, minimizes the risk of inconsistent verdicts. Given these many advantages, RCr 6.18 provides for the liberal joinder of offenses.

*Peacher*, 391 S.W.3d at 836–37. We have also acknowledged that, even considering the advantages of the joinder of trial, joinder is nevertheless limited to cases in which there is a sufficient nexus between the acts. *Id.* at 837.

> The required nexus does not arise simply from the proximity of the alleged crimes in time and space, although proximity is certainly relevant, but rather from a "logical" relationship between them, some indication that they arose one from the other or otherwise in the course of a single act or transaction, or that they both arose as parts of a common scheme or plan.

*Id.* The Commonwealth's theory of the case involved both defendants working together to find opportunities for each other to abuse the minor children. The abuse of the children happened over the same period of time and involved overlapping children,[3] the same familial structure, and the same living arrangements. The uniformity of acts and evidence present in this case creates the sort of series of acts, happening during the same course of time in the

---

[3] Watts was accused of abuse against A.D. and G.T. while James Lewis was accused of abuse against A.D., M.D., and G.T.

same residence, that are so closely connected as to maximize the utility of a joint trial. "[C]onsiderations of judicial economy and the efficiency of avoiding multiple trials are reasons for joint trials." *Garrett v. Commonwealth*, 534 S.W.3d 217, 223 (Ky. 2017). One particular benefit in minimizing the number of trials which relate to the same acts or series of acts is that the victims are only put through the rigors of testifying at trial and reliving the alleged abuse once. The trial court acknowledged this when it said, "we've got alleged victims here. We can put them through it once or twice. And all of the things being equal, let's make it once."

While efficiency and concerns about putting the victims through multiple trials are prominent considerations in the joinder of trial, efficiency does not override defendants' rights to have the evidence weighed against them individually and to have their guilt assessed based on their acts alone. RCr 8.31 states:

> If it appears that a defendant or the Commonwealth is or will be prejudiced by a joinder of offenses or of defendants in an indictment, information, complaint or uniform citation or by joinder for trial, the court shall order separate trials of counts, grant separate trials of defendants or provide whatever other relief justice requires. A motion for such relief must be made before the jury is sworn or, if there is no jury, before any evidence is received. No reference to the motion shall be made during the trial. In ruling on a motion by a defendant for severance the court may order the attorney for the Commonwealth to deliver to the court for inspection in camera any statements or confessions made by the defendants that the Commonwealth intends to introduce in evidence at the trial.

Regarding prejudice and joinder of trials, we have noted that a "certain degree of prejudice is inherent in the joinder of offenses," and that "undue prejudice"

9

is "prejudice that goes beyond the inherent prejudice to that which is unnecessary and unreasonable." *Peacher*, 391 S.W.3d at 838.

> Although our rule mandates relief when such undue prejudice appears likely, we have entrusted application of the rule to the trial court's discretion, and we have many times noted that an erroneous severance ruling does not justify appellate relief unless it resulted in actual prejudice to the party opposing the ruling.

*Id.* (internal citations omitted).

> We "will not overturn a trial court's joinder determination absent a showing of actual prejudice and a clear abuse of discretion. We must be clearly convinced that prejudice occurred and that the likelihood of prejudice was so clearly demonstrated to the trial judge that the refusal to grant a severance was an abuse of discretion."

*Elam v. Commonwealth*, 500 S.W.3d 818, 822–23 (Ky. 2016) (quoting *Murray v. Commonwealth*, 399 S.W.3d 398, 405 (Ky. 2013)).

Watts argues that he was prejudiced by the joinder and this prejudice should have foreclosed the possibility of a joint trial. In his motions requesting a separate trial, Watts argued that he would be prejudiced by joinder in three ways. First, Watts argued that since he and his co-defendant have such similar names (James Edward Watts and James Lewis Watts), the jury would struggle to differentiate between the two defendants. Next, Watts argued that, because James Lewis was accused of assaulting three victims while Watts was only accused of assaulting two, having the jury hear testimony about a third victim not applicable to Watts would prejudice him. Last, Watts argued that he would be prejudiced by the introduction of statements James Lewis made to Kentucky State Police. The trial court denied his motions. Reiterating these same arguments, Watts argues that the trial court abused its discretion in

10

denying his motions, claiming that "joinder was 'so prejudicial as to be unnecessary or unreasonably hurtful'" in contradiction of *Elam*, 500 S.W.3d at 822.

In contemplation of the potential confusion with the defendants' similar names, the trial court noted,

> All these facts, in my opinion, would urge me strongly that it needs to be joined, that these charges need to be joined in one trial. Both from the standpoint of justice, of clarity, efficiency is part of it. But I mean, even from the standpoint of the defendant wanting to say it wasn't me, it was someone else, it would be more prejudicial to try them separately it would seem to me it would be easier to say, was it this one, or was it this one, in the same room. . . . I feel strongly based on these facts, two trials would cause much, much more confusion than a single trial with both of these gentlemen seated in the same courtroom.

In a later hearing, the trial court again opined that "yes, there's going to be confusion because of the similarities of the name, and it will not be as confusing, I think, as it would be in separate trials." We agree. While it is true that both defendants have the same first and last name, "[a] jury is presumed to be composed of men of average intelligence." *Eaton v. Commonwealth*, 19 S.W.2d 218, 224 (Ky. 1929). It is not beyond the ability of the average person to differentiate between two individuals with similar names. Moreover, it would likely be easier for the jury to track between the two defendants if the defendants sat before the jury and the jury was able to relate specific pieces of evidence to a specific person sitting in front of them. The alternative would be for the jury to hear evidence pertaining to one James Watts while hearing sporadic pieces of evidence involving an abstract James Watts who is not before them.

11

In addition, the trial court went through steps to minimize the risk of confusion by the jury. Throughout the trial, Watts was commonly referred to as "Bubba," which was the nickname the children knew him by, and James Lewis was referred to as simply "James." The defendants were seated behind name plates displaying each defendant's full name. The defendants were not seated directly next to each other at the defense table but were separated by two attorneys. The defendants kept their same seats each day of trial and did not move around. For each day of the trial, Watts wore a white shirt with a black tie, while James Lewis wore either a blue or grey shirt with no tie, making the two consistently easily distinguishable by appearance. The fact that the jury was able to distinguish between the two defendants and even between sets of allegations is evident in the fact that the jury acquitted Watts of all allegations concerning G.T. and acquitted James Lewis of some allegations against G.T. while still finding James Lewis guilty of some charges related to G.T.

Further, that evidence was presented concerning a victim only pertinent to James Lewis and not to Watts was not unduly prejudicial to Watts.

> [I]n assessing whether joinder resulted in undue prejudice, we have asked, with KRE[4] 404(b) particularly in mind, "whether evidence necessary to prove each offense would have been admissible in a separate trial of the other." *Roark v. Commonwealth*, 90 S.W.3d 24, 28 (Ky. 2002) (citing *Price v. Commonwealth*, 31 S.W.3d 885 (Ky. 2000) and *Rearick v. Commonwealth*, 858 S.W.2d 185 (Ky. 1993)). If so, then the evidentiary objections to joinder, at least, have been deemed answered. Id. *See also Keeling v. Commonwealth*, 381 S.W.3d 248, 270–72 (Ky. 2012) (murder and attempted murder

---

[4] Kentucky Rules of Evidence.

> charges properly joined because the two incidents would have been mutually admissible in separate trials).
>
> If not, if evidence of the separate offenses would not have been mutually admissible at separate trials, then we have asked further whether the jury's belief as to either offense was "substantial[ly] like[ly] ... [to have been] tainted" by inadmissible evidence of the other. *Rearick v. Commonwealth*, 858 S.W.2d at 188. Only if the defendant can show that he was thus actually prejudiced by an erroneous refusal to sever is he entitled to appellate relief.

*Peacher*, 391 S.W.3d at 838–39. Watts fails to meet that burden to show that he was actually prejudiced by the joint trial. Simply having the jury consider evidence not applicable to a defendant does not automatically input prejudice onto that defendant, lest the language of RCr 6.20, which states "all of the defendants need not be charged in each count," be rendered superfluous. Again, that the jury was able to track the separate counts and those who committed them is evidenced by Watt's acquittal of the charges related to G.T. and James Lewis' acquittal of some, but not all, of the charges related to G.T.

Finally, Watts asserts that the introduction of the following exchange between James Lewis and a police officer was prejudicial:

> **Officer**: Is there any reason you can think of that they would accuse you?
> **James Lewis**: No, I honestly don't know.

Quoting *Peacher*, 391 S.W.3d at 835, Watts asserts that James Lewis' statement "was not, by itself, inculpatory of the defendant" but "became so later in conjunction with the other evidence," to wit, the Commonwealth's theory that the children had no motive to lie. Watts asserts that James Lewis' statement, which implied that the children had no reason to make false allegations, along with the Commonwealth's "theory threaded throughout the

13

joint trial," bolstered the children's credibility in a way prejudicial to him. Watts further expands on his argument regarding his right to confront witnesses, discussed in more detail in Section D below.

Again, the deficiency in Watts' argument comes from his assumption that the jury is incapable of differentiating between evidence relevant to only one defendant. "The fact that evidence may pertain to one defendant but not the other is insufficient to establish the kind of prejudice needed for separate trials." *Humphrey v. Commonwealth*, 836 S.W.2d 865, 868–69 (Ky. 1992) (citing *Hoskins v. Commonwealth*, 374 S.W.2d 839, 842 (Ky. 1964)). The snippet of the conversation between James Lewis and Watts was carefully selected so as to minimize the potential for the statement to also implicate Watts.[5] The statement only refers to a potential motive for the children to accuse *James Lewis*, not *Watts*. Whether the children had a motive to accuse James Lewis is a separate issue of whether the children had a motive to accuse Watts, and one can imagine many reasons for why the children would have a

---

[5] Prior to trial, the Commonwealth originally sought to introduce the following exchange at trial:

> **Officer**: So, why should we not believe the kids that are saying that you molested them?
> **James Lewis**: I ain't saying you all shouldn't believe the kids, but at the same time, there's no proof there that I did it.
> ***Officer****: Is there any reason you can think of they would accuse you of this?*
> ***James Lewis****: No. Honestly, I don't know.*
> **Officer**: Do you think the kids are lying?
> **James Lewis**: Honestly and truthfully, I don't… I don't know that I would say lying.
> **Officer**: But you already said they are not liars.
> **James Lewis**: As far as I know, they ain't.

Only the italicized portion came in at trial.

14

motive or lack thereof to falsely accuse their stepfather of abuse that is not applicable to Watts.

Prior to the interview recording being played at trial, the Commonwealth told the jury several times that the statement was made by James Lewis. The Commonwealth also asked Sergeant David Dick, who was present at the time the interview was recorded and was testifying at trial, "Did you ask James Lewis Watts about the children's motive in making the accusations against him, James Lewis Watts?" Sergeant Dick replied, "Yes, ma'am, I did." The short snippet of the interview, containing only the single question and answer exchange recited above, was played for the jury. Clearly, the jury was aware that James Lewis made the statement, and that the plain language of the statement unambiguously referred only to potential motives for the children to accuse James Lewis. Just because the children had a motive (or lack thereof) to wrongly accuse James Lewis of sexual abuse does not automatically mean the same for Watts. Without evidence of actual prejudice, we cannot say that the trial court abused its discretion in ordering a joint trial.

**B. The trial court did not abuse its discretion in excluding evidence related to prior allegations of abuse made against men in Sarah's life because the evidence was barred under KRE 412 and its probative value was substantially outweighed by the danger of confusion of the issues.**

Next, Watts alleges that Sarah had a pattern of conduct in reporting false allegations of abuse by men previously in her life and contends that the trial court erred by limiting evidence related to such. This issue is preserved. Prior to trial, the Commonwealth filed a motion in limine, stating in part:

15

The defense may seek to present evidence that some of the victims, G.T. and A.D., have been victimized by someone other than Defendants or has engaged in sexual behavior with someone else. Any evidence of this type must be barred pursuant to KRE 412, commonly referred to as the 'rape-shield' rule. The potential questioning will not be useful in showing consent, cause of any injury, or to show the source of any bodily fluids and none of it pertains to or may be relevant to the crimes charged or to either Defendant. If such evidence were introduced, it would act only as a cudgel against the victim.

In response, Watts argued that the lack of physical evidence in this case made the victims' credibility of utmost importance, and that incidents in which others were falsely accused of abusing the victims would "bear directly on the credibility of the witnesses." In his response, Watts sought to question witnesses about the following prior allegations:

- A previous allegation had been made against the biological father in either Georgia or Alabama;
- The children had previously lived with a registered sex offender;
- [A.D.] alleged she was touched by a 15-year-old in 2017;
- [A.D.] made an accusation against her own brother, who has a pending sex charge;
- G.T. is charged with a sex offense in Marshall County;
- [A.D.] has a 2019 juvenile case from Meade County;
- [G.T.] made allegations that another of his mother's boyfriends made him stand in a corner.

At a pretrial conference addressing the Commonwealth's motion in limine, the trial court commented that the evidence would only be relevant if it knew that the allegations were false, which it did not. After the hearing, the trial court issued an order stating,

The Court will not permit counsel to question any witnesses about charges made by the alleged victims against other persons at other times or about crimes committed by others against the alleged victims. The basis of the current request is rumor of the possibility of other offenses having been committed against the alleged victims-

16

or by them against others, the existence of a juvenile case regarding one of the children and notice by the Commonwealth that a 15-year-old may have inappropriately touched one of the alleged victims. Given the stated grounds, questioning the alleged victims would amount to fishing, would violate the rape shield law and would likely cause confusion and proliferation of irrelevant or prejudicial issues. Defense counsel should properly examine these witnesses concerning the accuracy of their recollections and testimony, the degree of certainty of their identification of these Defendants as having committed the charged acts or other bad acts admitted into evidence, and any motive to fabricate the allegations. The Court will reconsider this ruling for good cause.

During trial, the trial court ultimately allowed the parties to ask the victims if they had made any prior allegations of sexual abuse against anyone other than Watts and James Lewis, but the parties had to accept the victims' answers regardless of what those answers were. However, the parties were permitted to further question the witnesses outside of the presence of the jury.

Both the father of G.T. and the father of A.D. and M.D. testified outside of the presence of the jury that allegations of a sexual nature were made against them, these allegations were false, an investigation found the claims to be unsubstantiated, and the allegations arose around the time their relationships with Sarah deteriorated. The father of A.D. and M.D. testified that the investigating agency told him that Sarah made the allegations against him, but that their breakup was not contentious and both he and Sarah had moved on to new partners when the allegations surfaced. Sarah admitted that she reported A.D.'s father after A.D. told Sarah that her father rubbed her genitals while giving her a bath. Sarah testified that the allegations were unsubstantiated but explained that A.D., who was around three years old at

17

the time, was uncooperative when medical professionals attempted to examine her.

Sarah also admitted that she lost custody of her children because she had married a sex offender, a man who had sexually abused Sarah when she was a child.

The father of G.T. testified that he was not aware who made the allegations, and that the allegations came about a year after Sarah had separated from him. He and Sarah were getting along during the time, and the allegations came soon after G.T. had spent a week with him.

On appeal to this Court, Watts argues that the trial court erred by excluding evidence related to Sarah's alleged pattern of conduct in reporting false allegations of abuse by men, and that the trial court's exclusion of evidence impeded his right to fully present his defense that the allegations were false. Watts argues that the evidence was relevant, and that the evidence's probative value substantially outweighed any danger of confusion of the issues.

"Since the trial court's unique role as a gatekeeper of evidence requires on-the-spot rulings on the admissibility of evidence, we may reverse a trial court's decision to admit evidence only if that decision represents an abuse of discretion." *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007). "[F]or a trial court's decision to be an abuse of discretion, we must find that the decision 'was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.'" *Id.*

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[,] and . .

18

. [i]f the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

KRE 103(a)(2).

KRE 412, commonly referred to as the "rape-shield law," pertains to the introduction of "[e]vidence offered to prove that any alleged victim engaged in other sexual behavior" and "[e]vidence offered to prove any alleged victim's sexual predisposition." KRE 412(a)(1)–(2). The evidence Watts sought to introduce was the opposite of evidence of the victims' sexual history. Watts sought to introduce the *absence* of sexual behavior by alleging that allegations made against men in Sarah's life were false. We have excepted prior accusations from KRE 412 protections only when they are demonstrably false, and then, only if probative under KRE 608(b), and further, they pass the balancing test under KRE 403. *Dennis v. Commonwealth*, 306 S.W.3d 466, 469 (Ky. 2010). Therefore, whether the evidence Watts sought to introduce is barred by KRE 412 depends first on whether the evidence was demonstrably false. "To meet that standard, the proponent must show that there is a distinct and substantial probability that the prior accusation was false." *Dennis*, 306 S.W.3d at 475. This standard of proof is less than absolute proof of falsity. *Perry v. Commonwealth*, 390 S.W.3d 122, 130 (Ky. 2012). To help guide this analysis, we have suggested that the following examples can demonstrate falsity, although these examples are not an exhaustive list:

> [T]he victim's recantation of the prior allegation, an investigation which establishes pertinent facts wholly inconsistent with the allegation, . . . circumstances strongly suggesting that the victim had a motive to fabricate the prior and current allegations[, and] . .

. if the alleged victim told different stories to different people or at different times.

*Id.* at 132.

Watts argues that the allegations were demonstrably false because the reports were unsubstantiated and because both fathers of Sarah's children testified that the allegations were untrue. This is insufficient to prove that the allegations were demonstrably false. We have specifically said that "a mere denial by the alleged perpetrator of the prior accusation or an inconclusive investigation would not be enough to demonstrate a distinct and substantial probability of falsity." *Id.* And, while the father of A.D. and M.D. testified that the allegations against him concerning A.D. were false, Sarah implicitly testified that the allegations were true when she explained that A.D. told her that her genitals hurt because her father touched her and demonstrated how he had done so. As for Watts' contention that the unsubstantiated findings somehow make the allegations demonstrably false, we have said that "investigations that do not exonerate but merely fail to substantiate are not sufficiently probative of falsity to justify breaching the alleged victim's shield." *Dennis*, 306 S.W.3d at 475. Unsubstantiated allegations only mean that there was not enough evidence of the allegations to support a finding that the allegation happened, not that the allegation, in fact, did not happen. Because Watts failed to prove that the allegations were demonstrably false, the past allegations of sexual abuse against men in Sarah's life are protected by KRE 412.

20

Even if the evidence had not been protected under KRE 412, the evidence's probative value was outweighed by the danger of prejudice and confusion of the issues. Unless subject to an exception, relevant evidence, which is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence", is admissible. KRE 401; KRE 402. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403. "[T]he 'probative value' or 'probative worth' of evidence is a measure of how much the evidence tends to make the fact it is introduced to prove more or less probable." *Wynn v. Commonwealth*, 713 S.W.3d 122, 129 (Ky. 2025). "Balancing the probative value of evidence against the danger of undue prejudice is a task properly reserved for the sound discretion of the trial judge." *Id.* at 128 (cleaned up).

Watts offers that the evidence was relevant and probative to show a pattern of conduct and motives for Sarah and the children to lie and make false allegations against Watts. "[I]f an alleged victim has made prior allegations of sexual assaults that are false, this potentially reflects on the credibility of the allegation being tried, and it potentially provides evidence of a motive to make false accusations in the case being tried." *Perry v. Commonwealth*, 390 S.W.3d 122, 129 (Ky. 2012).

21

The biggest flaw in Watts' theory is that there is not a consistent pattern of conduct which would indicate that the allegations underlying this case were false. The first time that allegations were made and investigated in this case, A.D. had spoken with someone at her school. The second investigation came after G.T. reported them, at least two years after he had moved in with his father and was no longer in contact with his mother or sisters. Because Sarah was not the reporting source of these allegations, it is difficult to see how any prior allegations made by her would be relevant to this case. When asked if she had ever reported suspicions of sexual abuse on behalf of her children, Sarah admitted only that she had reported A.D. and M.D.'s father. There is no indication that Sarah has reported anyone else, and one instance of reporting falls far short of establishing a pattern of conduct. Even if it had, the allegations in this case were not made by Sarah, so that conduct would be irrelevant. Similarly, Watts sought to introduce G.T.'s testimony that every man his mother dated had been what he felt to be abusive towards him, but these allegations were not of a sexual nature nor were they made by Sarah. The children each testified that they had not reported anyone else for sexual abuse aside from the allegations in the current case,[6] rendering Watts allegation of a previous "pattern of conduct" hollow.

Each prior allegation, with their nuances and dissimilarities, would create multiple side issues for the jury and would bear minimally on the

---

[6] Presumably, A.D. does not recall the alleged incident involving her father when she was around three years old.

ultimate issue in the case. "The danger arising from 'confusion of the issues' refers to 'evidence that creates side issues that distract jurors from the real issues of the case.'" *Commonwealth v. Melton*, 670 S.W.3d 861, 867 (Ky. 2023) (quoting *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 715 (Ky. 2009)). It would be difficult for the jury to track the nature of each prior allegation, who made the allegation, against whom the allegation was made, who the allegation concerned, and the ultimate outcome of the allegation.

After the jury has completed this mental gymnastic, they are still left with the ultimate question of how, if at all, these prior allegations of abuse make the matter of Watts' guilt any more or less likely. Watts claims that the evidence, taken together, shows that Sarah had a motive to lie, but Sarah did not make the allegations underlying this case and she had not been in contact with G.T. when he made the allegations in this case. Watts claims that the evidence shows that the children had a motive to lie, but the allegations of abuse by G.T.'s father and A.D. and M.D.'s father happened before the children could recall such a memory. To the extent that Watts implicitly argues that the children would absorb some motive to lie just from being around Sarah or the family in general, this does not explain how allegations surfaced years after the family was separated both from Sarah and partially from each other.[7] Given

---

[7] The charges in this case stem from allegations G.T. disclosed in 2020. G.T. moved in with his father around 2017, and A.D. and M.D. moved to Georgia in 2018 to live with their aunt. G.T. testified that he had minimal contact with Sarah and his sisters since moving and had not spoken with any of them in years. He testified that he spoke with his sisters only a handful of times after he moved in with his father, and that the conversation was general and they had not discussed anything related to the sexual abuse allegations.

23

that the allegations have not been proven demonstrably false, were made by various people, and some were actually proven *true,*[8] it is just as likely, if not more likely, that Sarah, a childhood victim of sexual abuse herself who later married her abuser and allowed him around her children, permitted her children to be exposed to a higher risk of abuse. A recurring theme of abuse in a family is certainly not solid evidence that everyone alleging the abuse is lying. Often, multiple similar allegations actually beg the opposite result.

Ultimately, the probative value of the evidence, taken together to form a course of conduct theory, is low and outweighed by the danger of confusing and misleading the jury. The trial court did not abuse its discretion in excluding the evidence of prior allegations against others.

### C. The trial court did not abuse its discretion in allowing the Commonwealth to play videos depicting G.T. and Watts for the jury.

This error is preserved. Before trial, the Commonwealth filed a motion seeking to introduce two videos from Watts' YouTube account at trial. The videos were of Watts and G.T. In the first video, G.T. and Watts are in the kitchen, and Watts is keeping cookies out of G.T.'s reach while stating, "this is a good way to torture kids if they want some cookies." G.T. can be heard laughing and the tone of the interaction was teasing. The second video was taken in G.T. and Watts' shared bedroom. G.T. was dancing around in a cape and pretending to be "Captain Underpants." M.D. entered the bedroom, and

---

[8] The allegation that Sarah was abused as a child was apparently determined to be true as this was the basis for her losing custody of her children.

24

Watts told her that she "better take her ass to bed or else she's going to get her ass whooped." G.T. joked that he (G.T.) was "gay," then stated, "just kidding, I'm not," then Watts joked that, "he might not be kidding because he really is." Watts also called G.T. a "dumbass," but again, the overall tone of the video was teasing in nature. G.T. was heard giggling throughout the videos, and he testified that the videos were "just [him] and [Watts] messing around. I thought it was pretty funny, as you can see, I was kind of laughing myself because of the stuff I was saying." Neither video depicted the alleged crimes nor were they inherently sexual in nature, although the child appears to be dressed in either shorts or boxer-styled underwear in the videos.

The Commonwealth sought to introduce the videos taken during the timeframe of the alleged acts to corroborate G.T.'s testimony in terms of being alone with Watts in the bedroom the two shared and to show opportunity. Watts objected to the introduction of the videos, arguing that the purpose was for the jury to see the video of the child, "scantily clad," dancing around and presume that the logical next step would be sexual abuse. Watts maintained that posting a "funny video" of the child dancing around does not logically indicate that the person committed sex crimes against the child. The trial court entered an order allowing the introduction of the video evidence.

During trial, the Commonwealth moved to introduce the videos into evidence. The video was authenticated by G.T. out of the presence of the jury, and the trial court viewed the video for the first time. Watts renewed his objection, arguing that the videos are not relevant to show that the charged

25

offenses occurred because it would be unreasonable to infer that just because Watts instructed M.D. to go to bed, he wanted G.T. alone to sexually abuse him. Watts argued that the videos are instead prejudicial given that Watts threatens to spank M.D. if she does not go to bed and there were no allegations of either physical violence, photographs, or videos in this case. The trial court ruled that "it's not all that relevant except to put them in the house together. It's not prejudicial. So, not much relevance, not much prejudice, I'm going to let it in." The trial court allowed the Commonwealth to play the videos for the jury, but the jury was not permitted to take the videos back with them during deliberations.

"A trial judge's ruling as to the admissibility of evidence is reviewed under an abuse of discretion standard." *King v. Commonwealth*, 142 S.W.3d 645, 649 (Ky. 2004). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

On appeal to this Court, Watts argues that the videos were "inadmissible and highly prejudicial other acts evidence under KRE 404(b)," and that "[t]he trial court's ruling that the evidence was 'not all that relevant' and 'not prejudicial' was an abuse of discretion, requiring that [Watts'] convictions be reversed."[9] KRE 404(b) states:

---

[9] Both parties' arguments presume that KRE 404(b) is applicable to the video evidence. It is not immediately apparent that the video evidence is "[e]vidence of other crimes, wrongs, or acts" under KRE 404(b). Nonetheless, as neither party disputes

26

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible
>> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
>> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

"The admissibility of evidence under KRE 404(b) is evaluated under a three-part test: (1) relevance; (2) probativeness; and (3) prejudicial effect." *Gasaway v. Commonwealth*, 671 S.W.3d 298, 334 (Ky. 2023).

Generally, all relevant evidence is admissible. KRE 401. One exception to this rule is that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but the evidence is admissible if offered for a proper purpose. KRE 404(b). Here, the Commonwealth did not introduce the videos to prove that the alleged criminal acts occurred or to show that just because the defendant behaved in any sort of way in the videos means he must be the type of person that would sexually abuse a child. Instead, the Commonwealth introduced those videos to show opportunity, to refute defendant's suggestion during trial that Watts likely would not have had adequate alone time with the children to commit the crimes alleged, and to show the layout of the bedroom. The videos

---

KRE 404(b)'s applicability, and the outcome is ultimately the same regardless, we proceed arguendo as if it is.

27

were relevant to show that Watts lived with the children, shared a bedroom with G.T., and was sometimes alone with the children.

"After determining relevancy, the trial court must determine if the evidence of the uncharged crime is sufficiently probative of its commission by the accused to warrant its introduction into evidence. It is sufficiently probative if the trial judge believes 'the jury could reasonably infer that the prior bad acts occurred and that [the defendant] committed such acts.'" *Leach*, 571 S.W.3d at 554 (quoting *Parker v. Commonwealth*, 952 S.W.2d 209, 214 (Ky. 1997)). In addition to being probative of opportunity, the video, which displayed Watts' instruction to M.D. to get back in bed or else she would "get her ass whooped," suggests that Watts exercised authority over the children, a fact probative of in this case given allegations that Watts threatened to "whoop" A.D. if she disclosed the abuse.

The last question to be answered is whether the videos' probative value is "substantially outweighed by its prejudicial effect." *Leach*, 571 S.W.3d at 554. "Prejudice means that evidence produces an emotional response that inflames the passions of the triers of fact or is used for an improper purpose," *id.*, such as to "provoke[] [the jury's] instinct to punish or otherwise . . . cause a jury to base its decision on something other than the established propositions of the case," *Webb v. Commonwealth*, 387 S.W.3d 319, 328 (Ky. 2012). Watts argues that the videos were "highly" prejudicial. However, defense counsel's initial reaction when the trial court asked whether there were any statements made in the video that he should be aware of — "not really, no, just, the only reference

28

is the one about the gay stuff, that was the only [inaudible]" — reflects the overall lighthearted tone of the video that is otherwise lost in a sterile transcript.  Before this Court, Watts argues that "the videos depicted [him] calling G.T. names, 'torturing' G.T., and threatening physical violence against M.D.," but this takes the videos out of context and mischaracterizes them. G.T. testified only where the videos were taken and who was in them, and did not editorialize beyond that.  The videos spoke for themselves.  The tone of the videos, which defense counsel previously described as being "silly," were lighthearted, teasing, energetic, and joking.  While there was some name-calling and teasing in the videos, a reasonable viewer would interpret the videos as playful, not as "torture."  The prejudicial value, therefore, is low, and does not outweigh the video's probative value.  The trial court did not abuse its discretion in allowing the Commonwealth to play the videos for the jury.

**D. The trial court did not abuse its discretion or violate Watts' right to confront the witnesses against him when it admitted a statement made by James Lewis to police which implicated only James Lewis, or when it reconfigured the courtroom layout to position the witnesses in direct sight of the jury but with their backs turned to the defendants.**

Watts asserts that his Sixth Amendment to the United States Constitution[10] and Section 11 of the Kentucky Constitution[11] rights to confront witnesses against him at trial were violated.  He argues that the first violation

---

[10] The Sixth Amendment to the United States Constitution guarantees criminal defendants the right "to be confronted with the witnesses against him."

[11] Section 11 of the Kentucky Constitution guarantees criminal defendants the right "to meet the witnesses face to face."

29

occurred when the trial court allowed evidence to be admitted of statements made by James Lewis to police and Watts was unable to cross-examine James Lewis because James Lewis did not testify. He argues that the second violation occurred when the witnesses were seated with their backs turned to the defendants and Watts was deprived of direct face-to-face confrontation. This issue is preserved.

"Since the trial court's unique role as a gatekeeper of evidence requires on-the-spot rulings on the admissibility of evidence, we may reverse a trial court's decision to admit evidence only if that decision represents an abuse of discretion." *Clark v. Commonwealth,* 223 S.W.3d 90, 95 (Ky. 2007). "[F]or a trial court's decision to be an abuse of discretion, we must find that the decision 'was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.'" *Id.*

As discussed in Section A above, the trial court allowed the following exchange between James Lewis and a police officer to be played for the jury at trial:

> **Officer**: Is there any reason you can think of that they would accuse you?
> **James Lewis**: No, I honestly don't know.

Watts asserts that this conversation was prejudicial towards him and should not have been permitted at trial because he did not have the opportunity to cross-examine his co-defendant, James Lewis, who exercised his right to not testify at trial.

30

"In a joint trial, the Confrontation Clause ban applies even to hearsay statements offered as evidence against the co-defendant declarant himself, if the declarant does not testify and if the statement either expressly or by immediate implication tends to incriminate another defendant." *Peacher*, 391 S.W.3d at 834.

> [T]he Confrontation Clause does not rule out joint trials or the use at joint trials of non-testifying defendants' out-of-court statements or confessions, provided that the statements are redacted so as to remove express or immediately obvious inferential references to defendants other than the confessor, and provided that the jury is admonished to consider the statements as evidence against the confessor alone.

*Id.* Evidence which may, on its own, not be inculpatory may be considered so when viewed "in conjunction with other evidence." *Id.* at 835.

Watts argues that the statement made by James Lewis incriminated Watts. As discussed in Section A above, the statement only refers to a potential motive for the children to accuse *James Lewis*, not *Watts*. Watts admits that the statement "was not, by itself, inculpatory" of Watts but asserts that, to the extent that the "statement implied that the three minor children had no reason to make false allegations," it became inculpatory against Watts when "taken in conjunction with the Commonwealth's theory threaded throughout the joint trial that the children had no motive to lie."

The obvious flaw with this theory is that the Commonwealth's theory of the case is not evidence. Even if it were, the statement speaks for itself and refers only to any motive to fabricate allegations against *James Lewis*. The snippet of the conversation was carefully selected to avoid any potential

31

reference to Watts and any broad reference that could also apply to James Lewis. The officer had asked, "Is there any reason you can think of that they would accuse **you**?" and James Lewis replied "No, I honestly don't know." (emphasis added). The statement was specific to James Lewis. No other piece of evidence attaches to the statement to make it applicable to Watts. To make Watts' theory workable, Watts needed other evidence in the record that indicates that if the children had no motive to lie about James Lewis, they also had no motive to lie about Watts. Watts has not presented us with any evidence to that effect. To the extent that Watts argues that "the statement bolstered the credibility of the children, . . . they had no reason to lie, and therefore the allegations were true," the statement still only bolstered the children's credibility that they had no reason to lie **about James Lewis** and that the allegations **against James Lewis** were true. Any motive to fabricate evidence against Watts went unexplored and remained an open question before the jury.

Ultimately, the statement made by James Lewis did not incriminate Watts and thus, his confrontation rights were not violated. The trial court did not abuse its discretion in allowing the statement made by James Lewis to police to be admitted at trial.

Next, Watts argues that the trial court violated his confrontation rights when it permitted the witnesses to sit with their backs to the defendant while testifying to the jury. The trial court had arranged for a table to sit in the middle of the court room for witnesses to sit facing the jury. The trial court

32

explained that it did this so the witnesses can sit in full view of the jury, apparently because the original courtroom layout meant that the witnesses would have been at least partially blocked had they sat in the witness box. The trial court also explained that children tend to hide behind walls if they are available, but putting the child witness at the table would make the child more at ease.

The United States Constitution and the Kentucky Constitution both provide the right to confront witnesses, but their wording is slightly different. The Sixth Amendment to the United States Constitution guarantees criminal defendants the right "to be confronted with the witnesses against him," while Section 11 of the Kentucky Constitution guarantees criminal defendants the right "to meet the witnesses face to face." Even though these differences may at first glance appear material to this case, we have addressed a similar case in which the defendant's view of the witnesses was blocked. In *Sparkman v. Commonwealth*, 250 S.W.3d 667, 668–69 (Ky. 2008), the trial court permitted the prosecutor, at the request of the child witnesses, to stand between the witnesses and the defendant while they gave their testimony. In *Sparkman*, we noted that, despite the language differences, the right guaranteed by Section 11 of the Kentucky Constitution and the Sixth Amendment to the United States Constitution is "basically the same."

The Supreme Court of the United States has recognized that "the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial," but this preference "must occasionally give way to considerations of

33

public policy and the necessities of the case." *Maryland v. Craig*, 497 U.S. 836, 849 (1990) (emphasis in original). Accordingly, the Confrontation Clause has been interpreted "in a manner sensitive to its purposes and sensitive to the necessities of trial and the adversary process." *Id.* Trial courts "have the inherent authority and discretion to control the decorum and conduct of those in the courtroom to ensure that neither the defendant nor the Commonwealth is denied a fair trial." *Allen v. Commonwealth*, 286 S.W.3d 221, 230 (Ky. 2009).

Here, the trial court was motivated by a concern for the jury to fully observe the child witnesses as they testified. The trial court indicated that the original layout of the courtroom would have blocked the jury from fully observing the witnesses' faces as they testified. As the trial court explained, "if you can only see this much of a witness [non-verbally indicating that only the top half of the witnesses' face is visible behind the witness stand], not much credibility is being determined except from the tone of voice. This eliminates that — or reduces that, I should say. Your whole body can give signals as to truthfulness or not." It is the province of the jury — and the jury alone — to determine credibility through visual observation of body language. *Carson v. Commonwealth*, 621 S.W.3d 443, 449 (Ky. 2021). If confronted with only two options — the defendants are able to observe the witnesses' face or the jury is able to observe the witnesses' face — it is clear that the trial court made the correct choice in placing the jury's observation of utmost importance.

On the other hand, there is no indication that the inability for the defendant to personally observe the witnesses face while they spoke was

34

detrimental to his ability to assist in his defense. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Craig*, 497 U.S. at 845. The trial court encouraged defense counsel to reposition themselves in front of the witnesses as they testified, and defense counsel heeded this advice. While Watts is correct in asserting that a witness is likely to be more truthful when speaking about the defendant in front of the defendant, the witnesses still knowingly remained in the presence of the defendants while testifying. And, while Watts correctly noted that "face-to-face confrontation 'enhances the accuracy of factfinding by reducing the risk that a witness will wrongfully implicate an innocent person,'" *id.* at 846, the witnesses in this case each faced and identified both defendants while giving their testimony about the defendants. It is unclear what benefit the defendant would receive in a face-to-face assessment of the witnesses' credibility. Even if the defendant does perceive that the witness is being untruthful, the defendant and the witnesses for the Commonwealth are inherently adversarial, and it is to be expected that the defendants will either disagree with the witnesses' testimony or hope that the jury will disagree.

Weighing considerations of public policy and the necessities of the case, it is clear that the trial court made the most appropriate decision to allow the jury to assess the credibility of the witnesses. Therefore, the trial court did not abuse its discretion in configuring the courtroom layout to allow the witnesses

35

to be seated in direct sight of the jury, albeit with their backs turned to the defendants.

**E. It was not a violation of Watts' Kentucky statutory restraints on double jeopardy to be convicted of both indecent exposure and sodomy because his conduct established the commission of both offenses and distinct facts in the same incident supported the convictions.**

Lastly, Watts contends that his Kentucky statutory restraints on double jeopardy were violated when he was convicted of both indecent exposure in the first degree and sodomy in the first degree because "the exact same facts proved both offenses" and the indecent exposure was incidental to the sodomy.

Watts did not preserve this issue but alleges that it amounted to palpable error. *See Cardine v. Commonwealth*, 217 S.W.3d 219, 221 (Ky. 2007) ("Double jeopardy violations can be addressed as palpable error because the nature of such errors is to create manifest injustice.").

> For an error to be palpable, it must be "easily perceptible, plain, obvious and readily noticeable." A palpable error "must involve prejudice more egregious than that occurring in reversible error[.]" A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings. Thus, what a palpable error analysis "boils down to" is whether the reviewing court believes there is a "substantial possibility" that the result in the case would have been different without the error. If not, the error cannot be palpable.

*Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006).

To be clear, Watts is not alleging a violation of the *Blockburger*[12] "same elements test," which prohibits convictions under multiple distinct offenses

---

[12] *Blockburger v. United States*, 284 U.S. 299 (1932).

36

arising out of the same conduct unless the offenses contain elements not included in the other. Instead, Watts alleges that his prosecution under both indecent exposure and sodomy violated KRS[13] 505.020(1), which states:

> When a single course of conduct of a defendant may establish the commission of more than one (1) offense, he may be prosecuted for each such offense. He may not, however, be convicted of more than one (1) offense when:
> . . . .
> (c) The offense is designed to prohibit a continuing course of conduct and the defendant's course of conduct was uninterrupted by legal process, unless the law expressly provides that specific periods of such conduct constitute separate offenses.

The indecent exposure and sodomy counts both arise out of the incident in which Watts exposed himself to A.D. in Watts' bedroom and instructed her to perform oral sex on him. The jury was instructed to find Watts guilty of First-Degree Sodomy, Victim Under 12 if they believe that "he engaged in deviate sexual intercourse with [A.D.] when he put his penis into the mouth of [A.D.] in his bedroom after he told her to 'suck my wee-wee'" and that at the time of such intercourse, A.D. was less than twelve years old. The jury was instructed to find Watts guilty of First-Degree Indecent Exposure if they believe that "he intentionally exposed his genitals to [A.D.] in his bedroom under circumstances in which he knew such conduct was likely to cause affront or alarm," and that at the time of such exposure, A.D. was less than eighteen years old. To be sure, indecent exposure requires knowledge that the conduct was likely to cause affront or alarm, which sodomy does not, and sodomy

---

[13] Kentucky Revised Statutes.

37

requires deviate sexual intercourse, which indecent exposure does not. The jury found Watts guilty under both instructions.

Watts alleges that, because the same facts testified to were used to prove both offenses, his Kentucky statutory rights against double jeopardy were violated. Specifically, Watts alleges that being convicted of both offenses went against KRS 505.020(1)(c)'s prohibition against convictions of more than one offense when "[t]he offense is designed to prohibit a continuing course of conduct and the defendant's course of conduct was uninterrupted by legal process, unless the law expressly provides that specific periods of such conduct constitute the same offense." Watts hangs his argument on the assumption that the offenses he was convicted of were "designed to prohibit a continuing course of conduct" but provides scant basis for such an assumption. KRS 505.020(1)(c) is an exemption to KRS 505.020(1)'s general rule that "[w]hen a single course of conduct of a defendant may establish the commission of more than one (1) offense, he may be prosecuted for each such offense." Whether an offense is intended to cover a course of conduct is a matter of statutory intent. "[I]f the text does not refer to a course of conduct and instead only refers to singular and specific acts, each offense may be charged individually." *Howard v. Commonwealth*, 496 S.W.3d 471, 477 (Ky. 2016). "The real question is whether it was the individual acts which are prohibited, or the course of action they constitute. If it is the individual acts, then each act is punishable separately, but if it is a single course of conduct, there is only one punishment." *Welborn v. Commonwealth*, 157 S.W.3d 608, 612 (Ky. 2005).

38

KRS 510.148 states, "A person is guilty of indecent exposure in the first degree when he intentionally exposes his genitals under circumstances in which he knows or should know that his conduct is likely to cause affront or alarm to a person under the age of eighteen (18) years." KRS 510.070(1)(b)(2.) states, "A person is guilty of sodomy in the first degree when [h]e engages in deviate sexual intercourse with another person who is incapable of consent because he [i]s less than twelve (12) years old." KRS 510.010(1) defines "deviate sexual intercourse" in part as being "*any act* of sexual gratification involving the sex organs of one person and the mouth or anus of another." (emphasis added). Neither the statute defining indecent exposure nor the statute defining sodomy suggest that they require a continuing course of conduct. Rather, sodomy in the first degree has been committed when a person engages in "*any act* of sexual gratification involving the sex organs of one person and the mouth or anus of another" "with another person who is incapable of consent because he is less than twelve (12) years old." KRS 510.070(1)(b)(2.); KRS 510.010. Each act constituting the offense under these statutes is an individual act and punishable separately. *See Welborn*, 157 S.W.3d at 612. Likewise, each time a person "intentionally exposes his genitals under circumstances in which he knows or should know that his conduct is likely to cause affront or alarm to a person under the age of eighteen (18) years" constitutes an individual offense and is punishable separately. *Id.*; KRS 510.148.

Further, KRS 505.020(1)(c) does not "bar the prosecution or conviction upon multiple offenses arising out of a single course of conduct when the facts establish that two or more separate and distinct attacks occurred during the episode of criminal behavior." *Spicer v. Commonwealth*, 442 S.W.3d 26, 31 (Ky. 2014). In *Spicer*, we distinguished between separate and distinct offenses and offenses "designed to prohibit a continuing course of conduct." 442 S.W.3d at 31. We distinguished between the improper conviction of both attempted murder and first-degree assault for rapid gunfire when the evidence did not support "a reasonable conclusion that some of the shots were fired with the intent to wound while others were fired with the intent to kill" because the defendant did not have "ample time to pause and reflect[] and reformulate his intention between each shot," and the proper conviction "of three counts of first-degree assault after [the defendant shot] a trooper three separate times, with each shot preceded by a sufficient period of time in which the defendant could reflect on his conduct and formulate an intent to commit another act." *Id.* at 30–31. In both situations, the main question to be answered was whether each offense could be legally satisfied independently of the others given the facts of the case.

Counter to Watts' arguments, there was evidence of a cognizable lapse in Watts' conduct to constitute two separate acts to support a conviction under both statutes. All the elements necessary for a finding of indecent exposure — exposing himself to A.D. under circumstances in which he knew such conduct was likely to cause affront or alarm — were present and completed before the

40

sodomy ever began. A.D. testified that Watts called her into his bedroom, stood in front of the door to prevent anyone from opening the door, pulled his pants down, she saw his penis, and then Watts instructed her to perform oral sex on him. A.D. briefly described how Watts' penis appeared and that she observed that he was still wearing a shirt despite having pulled his pants down. This evidence indicates that there was a span of time before the sodomy began in which Watts exposed himself to the child, in a way that he knew was likely to cause affront or alarm, without having yet engaged in deviate sexual intercourse with A.D. Had the sodomy never occurred, and the incident ended with his exposure to the child, sufficient grounds existed nonetheless to find Watts guilty of indecent exposure. In the same vein, the underlying facts giving rise to the sodomy charge existed independently of the indecent exposure charge. After the indecent exposure was completed, Watts engaged in deviate sexual intercourse with the child. While the offenses all occurred in the same incident, the offenses were separate and took place at distinct — however brief — moments.

Watts further contends that, because A.D. did not testify to how she felt upon Watts pulling his pants down and exposing himself to her, there was insufficient evidence to support an indecent exposure conviction separate from the facts involved in the sodomy conviction. This misconstrues the statutory elements of the offense. KRS 510.148 states that "[a] person is guilty of indecent exposure in the first degree when he intentionally exposes his genitals under circumstances in which he knows or should know that his conduct is

41

likely to cause affront or alarm to a person under the age of eighteen (18) years." The relevant mental state is the defendant's, not the victim's. Watts does not contest that the exposure was likely to cause affront or alarm to A.D., and whether it actually did cause affront or alarm to A.D. is irrelevant under the statute.

Ultimately, because Watts' conduct met the statutory elements for both sodomy and indecent exposure, and distinct facts supported these offenses, the trial court did not violate Watts' statutory double jeopardy protections or commit palpable error.

## III.   CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

All sitting. Lambert, C.J.; Bisig, Conley, Goodwine, Keller and Nickell, JJ., concur. Thompson, J., dissents without opinion.


COUNSEL FOR APPELLANT:

Jennifer Elizabeth Hubbard
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Kentucky Attorney General

Joseph Crawford White
Assistant Attorney General